**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-2330-WJM-NYW

JOHN TEETS,

      Plaintiff,

v.

GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY,

      Defendant.

---

**ORDER GRANTING MOTION FOR CLASS CERTIFICATION AND DENYING
RULE 702 MOTION TO EXCLUDE EXPERT TESTIMONY**

---

      Plaintiff John Teets ("Plaintiff") brings this lawsuit against Defendant Great-West Life & Annuity Insurance Company ("Defendant") for Defendant's alleged breaches of its fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq*.  Currently before the Court is Plaintiff's Motion for Class Certification.  (ECF No. 75.)  Also before the Court is Defendant's Motion to Exclude Expert Opinion of Steven Pomerantz on Excess Fee[1] and Damages (ECF No. 96), which is intertwined with Plaintiff's motion.

      The parties have jointly requested oral argument.  (ECF No. 108.)  The parties do not certify that any argument would "be handled by an attorney of record in the case who has seven years or less of legal experience," WJM Revised Practice Standard III.G, and the Court finds that oral argument is unnecessary in any event.  For the

---

[1] So in original.

reasons set forth below, Plaintiff's motion is granted and Defendant's motion is denied.[2]

## I.  BACKGROUND

This case arises out of a financial product known as the Great-West Key Guaranteed Portfolio Fund ("Fund"), which was operated and serviced by Defendant. (ECF No. 47 ¶ 2.)  Plaintiff was a participant in the Farmers' Rice Cooperative 401(k) Savings Plan ("Plan"), an employee pension benefit plan that offered various investment opportunities to its participants, including the Fund.  (*Id.* ¶ 9.)  At all times relevant here, Plaintiff elected to invest his Plan contributions in the Fund.  (*Id.*)

The Fund is an example of an investment product commonly known as a stable value fund or guaranteed investment contract.  (*Id.* ¶¶ 1–2; ECF No. 94-1 at 9–12.)[3]  The Fund invests in relatively safe securities, guarantees the principal, and also pays a certain amount of interest to its investors at a rate set prior to each quarter (the "credited rate").  (*See id.*; ECF No. 47 ¶¶ 12–13.)  The credited rate is determined unilaterally by Defendant, without any specified methodology, but the effective annual interest rate is guaranteed never to be less than 0%.  (*Id.*)  From an investor's perspective, then, the Fund operates rather like a savings account.  (ECF No. 94-1 at 11.)

---

[2] Most of the briefs and exhibits filed in support of or opposition to the various motions have been filed under Restricted Access.  In this order, the Court has endeavored to respect trade secrets, and has therefore discussed matters more generically than it might otherwise have done (*e.g.*, discussing certain pricing figures conceptually, without disclosing the underlying numbers).  Nonetheless, having weighed the parties' confidentiality interests against the public's right of access, the Court finds that any Restricted material quoted or summarized below does not qualify for Restricted Access to the extent quoted or summarized, particularly given the need to provide a proper, publicly available explanation of the Court's decision.  *See* D.C.COLO.LCivR 7.2.

[3] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly with respect to exhibits, and with respect to filings that contain prefatory material such as tables of contents and authorities.

Any Plan money invested in the Fund is not kept in a segregated account, but rather is deposited into Defendant's general account.  (ECF No. 47 ¶ 15.)  The Fund is thus backed by Defendant's company assets.  (*Id.*)

Defendant discloses to participants a fee of 89 basis points (0.89%) for managing the Fund.  (ECF No. 22-3 at 15.)  "Fee" is something of a misnomer, however, because Defendant does not charge this amount to Fund participants.  (ECF No. 74-19 at 6.)  "Rather, it is an estimate of [Defendant's] actual costs to operate [its] general account."  (*Id.*)  Eighty-nine basis points is supposedly enough to cover various expenses, including overhead, the purchase price of hedging instruments, a set-aside against the risk of investment default, and various other items.  (*Id.* at 6–7.)

Plaintiff believes that Defendant retains, as profit to itself, the Fund's investment returns minus 89 basis points and the credited rate.  (ECF No. 69 at 5–6.)  As will become clear below, the parties vehemently dispute whether this formula properly calculates Defendant's profits.  Nonetheless, Plaintiff contends that Defendant reaps substantial profits from the Fund to the detriment of Fund participants and allegedly in violation of fiduciary duties imposed by ERISA.  (ECF No. 47 ¶¶ 19–23, 34–57.)

## II.  RULE 702 ANALYSIS

The Court turns first to Defendant's Rule 702 Motion, because the issues it raises inform the class certification analysis.

### A.    Legal Standard

A district court must act as a "gatekeeper" in admitting or excluding expert testimony.  *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004).  Admission

of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc).

**B.      "Excluded Costs"**

Defendant's Rule 702 Motion centers around how precisely one should calculate Defendant's net profits on the Fund.  As noted above, Plaintiff claims that Defendant retains, as profit to itself, the Fund's investment returns minus 89 basis points and the credited rate.  Plaintiff comes to this conclusion through the report of his expert, Steven Pomerantz, PhD.  Pomerantz opines that 89 basis points and the credited rate are the only true costs that Defendant must subtract from the Fund's investment returns to calculate net profits, to the exclusion of other alleged costs that might be factored into the equation.  (ECF No. 74-19 at 6–8 & nn.5–6.)

Defendant argues that Pomerantz's choice to exclude other alleged costs makes his methodology fundamentally flawed, and renders his report contradictory to

4

established facts.  (ECF No. 82 at 14–19.)  Defendant points specifically to five alleged

costs, to which it refers as the "Excluded Costs": (1) the "pricing credit"; (2) cost of

capital; (3) marketing costs; (4) "yield enhancement charges"; and (5) "GPF C3

adjustments."  The Court will describe in turn each of the Excluded Costs and the

parties' arguments regarding them.  The Court will reserve for Part II.C, below, its

analysis of whether Pomerantz's exclusion of any of these items from his formula

requires exclusion of any portion of his report.

     1.   <u>Pricing Credit</u>

Defendant's pricing credit is somewhat complicated, but it is, at bottom, a

potential discount on administrative charges designed to encourage plan trustees to

include the Fund as an investment option for plan participants.

Defendant, as administrator of a retirement plan, requires compensation for its

administrative services (*e.g.*, appropriately distributing retirement contributions to

selected investment choices, maintaining a website and customer service call center,

sending out monthly statements, etc.).  (ECF No. 91 ¶ 3.)  "The dollars [Defendant]

needs to administer the plan can be paid for by the plan participants from an asset

charge against the dollars invested, by a plan participant fee, or from a combination of

the foregoing."  (*Id.*)

Defendant uses these administrative charges as a bargaining tool with plan

trustees who are considering investment options to offer to plan participants.  If the

trustee agrees to include the Fund as an investment option, Defendant estimates the

amount of money that plan participants will likely invest in the Fund, multiplies that

estimate by a specified number of basis points (*i.e.*, the pricing credit), and then

discounts the administrative charges by that amount.  (*Id.* ¶¶ 4–5.)  The number of

basis points comprising the pricing credit is apparently a trade secret, and is

unnecessary to disclose here, but it is uniform across all plans that elect to offer the

Fund as an investment option to participants.  (*Id.* ¶ 4; ECF No. 111 at 7, 8 n.4.)

Defendant argues that the pricing credit is a genuine economic benefit to plan

participants, and a concomitant cost to Defendant, and therefore cannot be ignored

when calculating Defendant's net profit on the Fund.  (ECF No. 82 at 10–11, 15; ECF

No. 88 at 11–12; ECF No. 111 at 7–10.)  According to Defendant, "[i]f Dr. Pomerantz

had included the . . . pricing credit as a cost in his formula . . . , the 'damages' would be

*negative* for much of the [class] period . . . ."  (ECF No. 82 at 12–13 (emphasis in

original).)  Pomerantz responds that the pricing credit is irrelevant given that it is a

discount on administrative services, with allegedly no true impact on Defendant's net

profit from the Fund.  (ECF No. 84-4 at 9–11.)  Plaintiff further contends that ERISA

does not permit Defendant to consider money it forgoes in an administrative, non-

fiduciary capacity when calculating profit generated from investments over which it has

a fiduciary duty.  (ECF No. 103 at 10–12.)

2.    Cost of Capital

State insurance regulators require insurance companies to set aside money to

cover potential losses on investments.  (ECF No. 82 at 8–9.)  This set-aside, known as

"risk based capital," must be invested "very conservatively."  (*Id.* at 9.)

> If the money were not set aside [in conservative
> investments], [Defendant] could use it for its own purposes
> and could earn the higher return it makes on [Defendant's]
> other capital . . . .  The Fund's "cost of capital" is the
> difference between the minimal amount [Defendant] earns

6

> from the set-aside capital and the larger amount that it would
> otherwise earn.

(*Id.* (citations omitted).)  In other words, cost of capital "is the opportunity cost of setting

aside money to support the Fund."  (*Id.* at 8.)

Pomerantz excluded cost of capital from his net profitability formula precisely

because it is an opportunity cost inherent in the business in which Defendant operates.

(ECF No. 74-19 at 8 n.6; ECF No. 74-16 at 6.)  Defendant claims that opportunity cost

is nonetheless a cost that should be considered.  (ECF No. 111 at 11–12.)

### 3.   Marketing Costs

Defendant claims that "there are marketing costs that [it] incurs related to the

Fund."  (ECF No. 82 at 9.)  Defendant's chief financial officer, Christine Moritz, states

that these marketing costs are not included in the 89 basis-point "fee" disclosed to plan

participants (ECF No. 83 ¶ 6(e)), but neither Moritz nor any other of Defendant's

witnesses quantify the claimed marketing costs.

This appears to be a fairly minor dispute.  Defendant spends little time arguing

the effect of marketing costs beyond claiming their existence.  Plaintiff responds that

Pomerantz could easily include marketing costs in his formula if Defendant would

disclose them.  (ECF No. 107 at 10.)

### 4.   Yield Enhancement Charges

"A yield enhancement charge arises when [Defendant] replaces one investment

instrument for another."  (ECF No. 88 at 14.)  As with marketing costs, Defendant does

not quantify the yield enhancement charges, nor does it dwell on them beyond noting

their existence.  Pomerantz actually considered the yield enhancement charges, which

were small, and determined that they were more than offset by other minor sources of revenue, which he conservatively excluded from his calculations (*i.e.*, gave Defendant the benefit of the doubt that the additional revenue was not profit to Defendant).  (ECF No. 74-19 at 7 n.5.)

     5.   <u>GPF C3 Adjustments</u>

GPF C3 adjustments (a.k.a., the "monoline make whole charge") account for default on collateralized mortgage obligations held in the Fund.  (ECF No. 88 at 14.)  As with marketing costs and yield enhancement charges, Defendant spends very little time on this expense.  As with yield enhancement charges, Pomerantz considered the GPF C3 adjustments but excluded them because they were outweighed by revenue he also chose to exclude.  (ECF No. 74-19 at 7 n.5.)

**C.**    **Admissibility of Pomerantz's Report**

Although Defendant attacks Pomerantz's methodology, the methodology *per se* is not in dispute.  All parties agree that Defendant's net profitability equals its gross revenue minus its costs.  Pomerantz applies that methodology.  However, he disagrees with Defendant regarding what should actually count as costs.  He also gives reasoned explanations for his disagreement, and a factfinder could reasonably credit those explanations,[4] particularly given the dispute over whether Defendant, outside of this litigation, really treats the Excluded Costs as costs chargeable to the Fund, and particularly whether Defendant accounts for them when evaluating the Fund and setting the credited rate.  Defendant is motivated in this case to make its profit on the Fund

---

[4] No party has demanded a jury in this action, likely due to the fundamentally equitable nature of the causes of action available under ERISA.  Thus, the Court will be the factfinder.

look as small as possible, and perhaps it is small.  But taking Defendant's arguments at face value, one gets the impression that the Fund is constantly losing money or, at best, barely breaking even, particularly due to the pricing credit and cost of capital. Defendant nowhere actually claims as much, however, even after Plaintiff's accusation that "[Defendant's] suggestion that the [Fund] loses money is simply not credible." (ECF No. 107 at 6 n.2.)  Furthermore, Defendant's expert, David F. Babbel, PhD, represents that the Fund has generated a consistently positive and fairly steady "spread" or "margin" for Defendant since at least 2008.  (ECF No. 94-1 at 8, 25–27 & fig. 7.)  Since 2010, the spread has exceeded the credited interest rate to plan participants.  (*Id.*)

Defendant notes that it does not normally calculate the Fund's profitability standing alone, but rather determines profit at the plan level.  (ECF No. 82 at 10.) Conceivably, then, the Fund might still somehow be a perennial drag on plan-level profits—but that would be a surprising finding under the circumstances.  Plaintiff characterizes the Fund as "a flagship product" for Defendant (ECF No. 107 at 6 n.2), and Defendant does not dispute that assertion (*see* ECF No. 111).  In addition, Defendant obviously wants to make the Fund widely available, and therefore offers a discount on administrative fees (the pricing credit) to those plans that include the Fund. An economically rational firm generally would not make such a decision without first concluding that it could make up the discount and more through profits generated by the Fund.[5]

---

[5] Defendant argues, for the first time in its reply brief, that certain estimates and assumptions could lead Pomerantz's formula to calculate damages larger than the profit earned

In any event, exclusion under Rule 702 is not appropriate.  Plaintiff raises the possibility that ERISA does not permit the Court or the factfinder to consider at least the pricing credit and the cost of capital.  (*See* ECF No. 103 at 10–13; ECF No. 107 at 9.)  As explained in Part III.D.1.a, below, the Court agrees as to the pricing credit, making it irrelevant to the current analysis.  The Court defers ruling on the relevance of the remaining Excluded Costs until at least summary judgment, but even if ERISA permits consideration of the remaining Excluded Costs, this entire dispute still raises a fairly typical battle of the experts, with Pomerantz claiming certain costs are irrelevant and Babbel claiming the opposite.  Defendant is free to cross-examine Pomerantz on these issues.  Moreover, with the possible exception of the pricing credit (which no longer matters), all of the Excluded Costs apply equally class-wide.  (*See* ECF No. 88 at 14 (referring to cost of capital, yield enhancement charges, and the GPF C3 adjustments, as costs that impose "variation in the aggregate profits on the Fund"); ECF No. 107 at 10 (arguing, without rebuttal from Defendant, that marketing costs could be included in Pomerantz's formula, if quantified by Defendant).)  Defendant is free to calculate the actual monetary impact of those Excluded Costs on the Fund's profitability and to argue that those numbers should also be subtracted from the Fund's gross revenues.  Plaintiff would be well advised to have Pomerantz develop alternative scenarios based on Defendant's Excluded Costs data, if Defendant gathers and discloses such data to

---

by Defendant's entire retirement services division on all products and services.  (ECF No. 111 at 10–11.)  Because Plaintiff never received an opportunity to respond to this argument, the Court will not evaluate it here except to say that Plaintiff should carefully consider whether Pomerantz's formula indeed leads to this result as applied to actual numbers received from Defendant (as opposed to estimates or assumptions).

Plaintiff.  Nonetheless, Pomerantz's opinion is not inadmissible for refusal to consider the Excluded Costs.

For all of these reasons, Defendant's Rule 702 Motion is denied.

## III.  CLASS CERTIFICATION ANALYSIS

### A.   Legal Standard

As the party seeking class certification, Plaintiff must first demonstrate that all four prerequisites of Federal Rule of Civil Procedure 23(a) are clearly met.  *Shook v. El Paso Cnty.*, 386 F.3d 963, 971 (10th Cir. 2004); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013).  These threshold elements consist of the following: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative party are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

If Plaintiff proves he has met these threshold requirements, he must then demonstrate that the action falls within one of the three categories set forth in Rule 23(b).  *Shook*, 386 F.3d at 971.  Here, Plaintiff seeks certification pursuant to Rules 23(b)(1) and (3).

The party seeking to certify a class bears the strict burden of proving the requirements of Rule 23.  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).  In determining the propriety of a class action, the question is not whether a plaintiff has stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.  *Anderson v. City of Albuquerque*, 690 F.2d 796, 799

11

(10th Cir. 1982).  When deciding whether the proposed class meets the requirements of Rule 23, the Court accepts the plaintiff's substantive allegations as true, though it need not blindly rely on conclusory allegations and may consider the legal and factual issues which the complaint presents.  *Shook*, 386 F.3d at 968; *see also Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009).  The Court should not pass judgment on the merits of the case, but must conduct a "rigorous analysis" to ensure that the requirements of Rule 23 are met.  *D.G. ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

The decision whether to grant or deny class certification "involves intensely practical considerations and therefore belongs within the discretion of the trial court." *Tabor*, 703 F.3d. at 1227.

## B.     Proposed Class

Plaintiff proposes the following Class definition: "all participants in and beneficiaries of defined contribution employee pension benefit plans within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), who had funds invested in the [Fund] from six years before the filing of this action until the time of trial."  (ECF No. 69 at 2.) Defendant states no specific objection to this proposed definition.

## C.     Rule 23(a)

The Court's first task is to ensure that the Federal Rule of Civil Procedure 23(a) requirements are satisfied as to the proposed Class: (1) the class is so numerous that joinder of all members is impracticable ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the

representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy").  The Court will address each of these considerations in turn.

      1.    <u>Numerosity</u>

Plaintiff claims that, as of November 2015, there were more than 270,000 ERISA plan participants invested in the Fund.  (ECF No. 69 at 7.)  Defendant confirms this number and notes that these participants come from 13,600 retirement plans.  (ECF No. 88 at 11.)  Defendant makes no specific objection to the numerosity component of the Rule 23(a) analysis.

Given that 270,000+ Class members would make joinder impracticable, and given Defendant's non-opposition on this point, the Court finds that the numerosity requirement is satisfied.

      2.    <u>Commonality</u>

Defendant similarly does not contest Plaintiff's assertion that there are questions of law or fact common to the Class.  Such questions certainly exist, most notably whether ERISA's fiduciary standard applies to Defendant's management of the Fund or, conversely, whether the Fund falls under ERISA's guaranteed benefit policy exemption. *See Teets v. Great-West Life & Annuity Ins. Co.*, 106 F. Supp. 3d 1198, 1201–03 (D. Colo. 2015).  The commonality requirement is therefore satisfied.

      3.    <u>Typicality & Adequacy</u>

The  typicality and adequacy requirements of Rule 23(a) "tend to merge," *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 162 n.13 (1982), and Defendant challenges Plaintiff's typicality and adequacy together (ECF No. 88 at 30–31).  The Court will

13

therefore analyze them together.

Defendant argues that the Plaintiff is insufficiently educated about this case to be an adequate class representative.  (ECF No. 88 at 31.)  Defendant points to Plaintiff's deposition, where Plaintiff expressed uncertainty about ever reviewing the complaint, could not recall reviewing his interrogatory answers before they were transmitted to Defendant, and generally displayed uncertainty about a number of issues.  (*Id.*)  In particular, Plaintiff testified that he first learned the day before the deposition that the "spread" or "margin" retained by Defendant was the main issue.  (*Id.*)

Although "[p]laintiffs may be found to be inadequate representatives where they are not familiar with the basic elements of their claims, [or] have an almost total lack of personal knowledge of their claims," *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 583–84 (D. Colo. 2002) (citations omitted), this analysis cannot be divorced from the type of claims at issue.  This is an ERISA case.  ERISA is "an enormously complex and detailed statute."  *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993).  Very few lawyers, much less rice farmers, understand ERISA.  The Court does not condone class counsel's perfunctory relationship with a named plaintiff (if that is what actually exists here, as opposed to a situation where, *e.g.*, a plaintiff simply forgets what he has learned from his lawyers and when he learned it).  Nonetheless, under the circumstances, Plaintiff has displayed adequate knowledge of the claims at issue, even if he may have come to that knowledge later in the process than he should have.

Defendant also argues that Plaintiff is subject to a unique defense because he agreed at his deposition that the Fund's credited interest rate was not artificially low for at least a portion of the class period.  (ECF No. 88 at 30–31.)  Plaintiff's testimony on

14

this point is not as straightforward as Defendant characterizes it.  Defendant never defined "artificially low" with precision, and Plaintiff further testified that his answer could turn on what ERISA requires.  (*See* ECF No. 95-1 at 13–14 (stating, in response to a hypothetical about a "fair rate" of return to Defendant, that his answer would depend on "[w]hether [Defendant is] allowed to do that or not").)  Thus, this is not the clear admission that Defendant claims.  Even if it were a clear and binding admission, it does not "threaten to become the focus of the litigation."  *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990).  Thus, it is not a basis to disqualify Plaintiff.

The Court accordingly rejects Defendant's challenges to Plaintiff's typicality and adequacy.  The Court therefore finds that Plaintiff satisfies all elements of the Rule 23(a) analysis.

**D.    Rule 23(b)**

Plaintiff must now establish that his proposed class action matches one of the scenarios described in Rule 23(b).  Plaintiff argues that the scenarios described in Rules 23(b)(1) and 23(b)(3) are both present here.  The Court will discuss these in reverse order because, in these circumstances, the 23(b)(3) analysis helps to frame the 23(b)(1) analysis.

1.    Rule 23(b)(3)

Rule 23(b)(3) permits class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Defendant focuses its challenge here, claiming that certain steps of the liability analysis, and essentially every step of any damages analysis, would require individualized discovery and resolution. (*See* ECF No. 88 at 18–28.)

> a.   *Effect of Excluded Costs*

Defendant first notes that, assuming it is an ERISA fiduciary with respect to the Fund, whether it breached its fiduciary duty will turn on the profits it earned as compared to the interest credited to Fund participants. Drawing on many of the same arguments presented in its Rule 702 Motion, Defendant then argues that its actual profit on the fund cannot be calculated without considering all of the Excluded Costs discussed in Part II.B, above. As relevant to the Rule 23(b)(3) analysis, however, Defendant asserts that the Excluded Costs matter because they change over time, and their effect varies from participant to participant, thus creating individual issues that will overwhelm common questions. (ECF No. 88 at 19–22.)

Defendant's argument must be judged in comparison to Plaintiff's theory of liability. Plaintiff claims that Defendant abused its discretion by setting the credited rate with its own profitability in mind rather than the best interests of Fund participants. More specifically, Plaintiff appears to argue that Defendant continually lowered the credited rate to ensure that its own profits remained fairly steady as overall interest income generated by the Fund's assets declined due to broader market conditions. (*See* ECF No. 47 ¶¶ 4, 17–19; ECF No. 74-19 at 11, 13; ECF No. 74-16 at 3; ECF No. 103 at 1.) In other words, when faced with a shrinking pot of money, Defendant allegedly chose to ensure its own profitability at the expense of Fund participants.

Defendant's decisions with respect to the credited rate are Fund-wide decisions. If Defendant indeed set the credited rate with its own profitability in mind, or if it set the rate such that Defendant reaped unreasonable compensation, Plaintiff seeks to recover the entire pot of ill-gotten gain (*i.e.*, what Defendant should have distributed as credited interest, minus what it actually distributed) under 29 U.S.C. § 1109(a) and various equitable theories.[6]  (*See* ECF No. 47 ¶¶ 36, 44; *id.* at 12–15.)  The amount of that pot then allocated to the various plans will certainly vary from plan to plan, but that is not a matter of Defendant's concern.  *Cf. In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1269 (10th Cir. 2014) ("[The defendant] has no interest in the method of distributing the aggregate damages award among the class members.").

In this light, at least one common issue has nothing to do with calculating the amount of allegedly inappropriate profits, namely, whether Defendant indeed set the credited interest rate with its own fiscal bottom line in mind.  Regarding the allegedly inappropriate profits, however, the relevant question when deciding whether common issues predominate is whether the various accounting inputs needed to evaluate Defendant's profit can be calculated on a classwide basis.

One such input is Defendant's gross return on the Fund.  Defendant has not clearly argued, and in any event has not established, that it cannot calculate gross revenues earned by the Fund over the class period.

Another input, obviously, is the credited rate itself.  This rate was set quarterly

---

[6] Damages *per se* are not available in ERISA actions.  *See generally Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002).

and was the same for all plans and Fund participants.[7]  Thus, it can be determined on a classwide basis.

The remainder of the important inputs to consider are the costs and expenses, apart from the credited rate, appropriately deducted from the gross revenue.  Plaintiff has already agreed that 89 basis points should be deducted because that is the amount disclosed to Fund participants as the estimated cost of administration.  Defendant does not argue that these 89 basis points should not be deducted.  Thus, this issue is common to the class.

Next come the Excluded Costs.  As stated above in Part II.C, all of the Excluded Costs with the possible exception of the pricing credit are chargeable to the Fund, if at all, in the aggregate.  All Fund participants bear them in proportion to the amount invested.  Thus, they present common, not individualized, issues.

The remaining issue, then, is the pricing credit.  Again, the pricing credit is an amount of plan administrative revenue that Defendant chooses to forgo when plan trustees include the Fund in their plans.  Defendant multiplies the amount it expects the plan participants to invest in the Fund by the pricing credit (a specified number of basis points) and reduces its administrative fee by that amount.  Defendant claims that it creates innumerable individualized issues because some participants invest less than their proportional share of the estimated plan contributions to the Fund and therefore benefit more (in the sense of receiving administrative services priced with the

---

[7] Plaintiff states that about 100 plans (out of 13,600) actually receive slightly higher credited rates, but such increases can be accounted for formulaically.  (ECF No. 69 at 5 n.4; ECF No. 74-19 at 13 n.13.)  Defendant nowhere argues otherwise.

expectation of a much higher amount of investment).  (ECF No. 88 at 21.)  Conversely,

Defendant earns comparatively more profit on participants who invest more than their

proportional share of the estimated plan.  (*Id.*)

The Court appreciates that the pricing credit may have an effect on Defendant's

overall bottom line, but having such an effect does not render it a cost attributable to the

Fund.  It appears to reflect, rather, Defendant's choice to wager its administrative

income against the money it believes it can make on the Fund.  Defendant cites no

authority that it can pass on this wager to plan participants, or that an ERISA fiduciary

can account for it in any way when exercising its discretion on behalf of plan

participants (such as when setting the crediting rate).

Although not directly on point, the Court finds *California Ironworkers Field*

*Pension Trust v. Loomis Sayles & Co.*, 259 F.3d 1036 (9th Cir. 2001), instructive on this

issue.  In *California Ironworkers*, an ERISA fiduciary was found liable for imprudently

overloading a pension trust with certain risky securities.  *Id.* at 1041–42.  The fiduciary

was ordered to restore to the plan the amount it likely would have made had it invested

more prudently.  *Id.* at 1046–47.  The fiduciary claimed that it should have been allowed

to offset this liability against "gains in excess of the benchmark which are attributable to

other portions of the [trust's] portfolio."  *Id.* at 1047.  The district court rejected this

argument and the Ninth Circuit affirmed.  *Id.*  The Ninth Circuit drew upon the

Restatement (Second) of Trusts for the proposition that an ERISA fiduciary "may *not*

balance losses attributable to a breach of trust against gains attributable to actions

which do not involve a breach of trust."  *Id.* at 1047–48 (citing Restatement (Second) of

Trusts § 213 cmt. c) (emphasis in original).[8]

The Court agrees with this principle as adapted to the allegations in this case. Assuming Defendant is an ERISA fiduciary with respect to the Fund, Defendant may not claim variations in Fund profits based on the alleged effects of decisions it made regarding administrative income, which is a separate issue.  Accordingly, the pricing credit is legally irrelevant to classwide liability or damages.

Finally, the Court notes Defendant's repeated assertions that the actual numbers underlying various accounting inputs changed over time.  (ECF No. 88 *passim*.)  The Court would be surprised if the case were otherwise, and it may be that liability and damages must be analyzed on a quarter-by-quarter basis, given that the credited rate was set quarterly.  But Defendant has not explained how this poses any barrier to class certification.

b.   *Consent, Estoppel, and Ratification*

Defendant claims that its affirmative defenses of consent, estoppel, and ratification would require "endless individualized hearings."  (ECF No. 88 at 23.) According to Defendant, many plan trustees received explanations from "[p]lan advisors (not [Defendant's] employees)" regarding "how [Defendant] earns its profit."  (*Id.*)  Some trustees "received complete, oral explanations," whereas other trustees may have received only partial explanations, but at least some of them arguably consented to Defendant's business model regardless of its potential effect on plan participants—

___

[8] *California Ironworkers* actually says that it is relying on the Restatement (Third) of Trusts, but the language it quotes and commentary it cites are all found in the Restatement (Second) of Trusts.  The Restatement (Third) of Trusts does not contain a section 213.  Section 101 of the Third Restatement, however, is the successor to section 213.

hence the alleged "endless individualized hearings to determine which plans, and which participants, are subject to the defenses of consent, waiver [*sic*] and estoppel." (*Id.*)

For two reasons, the Court agrees with Plaintiff that the defenses of consent, estoppel, and ratification are not available to Defendant in this context.  First, the two cases Defendant cites in which a court allowed those defenses in an arguably similar situation involved plan trustees who were themselves both plaintiffs and also primary beneficiaries of the plan.  (*See id.* at 22 (citing *Schetter v. Prudential-Bache Sec., Inc.*, 695 F. Supp. 1077, 1083 (E.D. Cal. 1988), and *McManus & Pellouchoud, Inc., Employees' Profit Sharing Trust v. Rothschild*, 1989 WL 100103, at *4 (N.D. Ill. Aug. 23, 1989)).)  Whether or not consent, estoppel, or ratification were appropriate in those contexts, the actions of plan trustees in this context do not bind plan participants because "[a]n affirmative defense that would allow a breaching fiduciary to insulate itself from liability at the expense of Plan beneficiaries is contrary to [the] language, structure, and purpose of ERISA."  *Openshaw v. Cohen, Klingenstein & Marks, Inc.*, 320 F. Supp. 2d 357, 365 (D. Md. 2004) (striking affirmative defenses alleging estoppel, waiver, and ratification).

Second, one of Plaintiff's claims is for violation of 29 U.S.C. § 1106(b)(1), which prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."  Section 1106(b)(1) violations are considered *per se* ERISA violations, and so trustee consent is legally irrelevant.  *See, e.g.*, *Barboza v. Cal. Ass'n of Prof'l Firefighters*, 799 F.3d 1257, 1269–70 & n.5 (9th Cir. 2015) (holding that ERISA fiduciary committed *per se* breach of its duties by paying its own fees and expenses

from plan assets, even though such payment was authorized by its contract with the plan to provide administrative services), *cert. denied*, 136 S. Ct. 1171 (2016).

Therefore, Defendant's defenses of consent, ratification, and estoppel do not raise individual issues that might overwhelm common questions.

            c.    *Rule 23(b)(3) Conclusion*

For all of the foregoing reasons, the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Moreover, Defendant presents no argument calling into question the requirement that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* Accordingly, the Court finds that the class should be certified under Rule 23(b)(3).

      2.    <u>Rule 23(b)(1)</u>

Plaintiff also seeks certification under Rule 23(b)(1), which states that certification is appropriate if

> prosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests . . . .

The Court finds that Rule 23(b)(1)(A) is satisfied. In particular, the Court finds at least the following matters that should be resolved as to all class members, thus

22

preventing inconsistent standards being imposed on Defendant:

- whether ERISA's fiduciary standard applies to Defendant's management of the Fund or, conversely, whether the Fund falls under ERISA's guaranteed benefit policy exemption, *see Teets*, 106 F. Supp. 3d at 1201–03;

- what Defendant may or may not appropriately consider when setting the credited rate; and

- whether Defendant's credited rate decision in any particular quarter(s) violated its ERISA fiduciary duties.

Thus, the class will be certified under Rule 23(b)(1)(A).

## E.  Rule 23(g)

Finally, the Court must evaluate the adequacy of class counsel.  In this analysis, the Court "must consider":

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g)(1)(A).  Furthermore, this Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class."  *Id.* 23(g)(1)(B).

The record shows that all of the mandatory factors which the Court must consider in regards to Plaintiff's counsel's experience, expertise, knowledge of the relevant law, and access to the necessary resources to properly prosecute this litigation as a class action are more than amply satisfied here.   (*See* ECF No. 69 at 15.)  Not surprisingly, Defendant nowhere contests Plaintiff's assertion that the requirements of Rule 23(g) have been satisfied.  Accordingly, Plaintiff's attorneys shall be appointed as class counsel.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Plaintiff's Motion for Class Certification (ECF No. 75) is GRANTED;

2.      The Court CERTIFIES the following class: "all participants in and beneficiaries of defined contribution employee pension benefit plans within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), who had funds invested in the Great-West Key Guaranteed Portfolio Fund from six years before the filing of this action until the time of trial";

3.      Pursuant to Federal Rule of Civil Procedure 23(g), the following law firms are appointed as class counsel: Feinberg, Jackson, Worthman & Wasow LLP; Schneider Wallace Cottrell Konecky Wotkyns LLP; the Law Offices of Scot D. Bernstein, P.C.; and Keller Rohrback LLP;

4.      Defendant's Motion to Exclude Expert Opinion of Steven Pomerantz on Excess Fee and Damages (ECF No. 96) is DENIED; and

5.      The parties' joint request for oral argument (ECF No. 108) is DENIED AS MOOT.

Dated this 22nd day of June, 2016.

BY THE COURT:

_____
William J. Martinez
United States District Judge
