IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 14-cv-02330-WJM-NYW

JOHN TEETS,

    Plaintiff,

v.

GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY,

    Defendant.

---

BRIEF OF *AMICUS CURIAE* AMERICAN COUNCIL OF LIFE INSURERS
IN SUPPORT OF DEFENDANT GREAT-WEST LIFE & ANNUITY
INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

---

James F. Jorden*
Waldemar J. Pflepsen, Jr.*
CARLTON FIELDS JORDEN BURT P.A.
1025 Thomas Jefferson Street NW
Suite 400 West
Washington, DC 20007
(202) 965-8100
jjorden@carltonfields.com
wpflepsen@carltonfields.com

Lisa Tate
AMERICAN COUNCIL
OF LIFE INSURERS
101 Constitution Avenue NW, Suite 700
Washington, DC 20001
(202) 624-2153
LisaTate@acli.com

Michael A. Valerio
John C. Pitblado*
CARLTON FIELDS JORDEN BURT P.A.
One State Street, Suite 1800
Hartford, CT 06103
(860) 392-5000
mvalerio@carltonfields.com
jpitblado@carltonfields.com

*Counsel for Amicus Curiae*
*American Council of Life Insurers*

* Admitted in the U.S. District Court for the District of Colorado

## CORPORATE DISCLOSURE STATEMENT

The American Council of Life Insurers ("ACLI") is a non-profit corporation organized under the laws of the State of Delaware. ACLI was founded in 1975 and incorporated as a non-profit corporation in 1976. ACLI is a national membership organization representing member companies. It has no parent corporation, issues no shares to the public, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

**IDENTITY AND INTEREST OF *AMICUS CURIAE*** ...................................................................1

**INTRODUCTION** ..........................................................................................................................2

**DISCUSSION** ................................................................................................................................3

I. **The Defined Contribution Plan Market and the Beneficial Role of Life Insurer General Account Products** ...........................................................................3

    A. The Emergence and Importance of Defined Contribution Plans.......................3

    B. The Role of Life Insurers in the Defined Contribution Plan Market ...............5

    C. The Value and Corresponding Popularity of General Account Guaranteed Insurance Products..............................................................................6

II. **Insurers Offering General Account Guaranteed Products are Not ERISA Fiduciaries** ........................................................................................................10

    A. Harris Trust Establishes that the Guaranteed Benefit Policy Exception Applies ...........................................................................................10

    B. Great-West Is Not Exercising Fiduciary Authority or Control Over Plan Assets .........................................................................................10

        1. The Great-West Key Guaranteed Portfolio Fund (the "Fund")..................................................................................................11

        2. General Account Assets.........................................................................12

III. Conclusion ........................................................................................................12

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*,
  729 F. Supp. 1162 (N.D. Ill. 1989), *aff'd,* 941 F.2d 561 (7th Circ. 1991) ............................... 12

*Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.*,
  713 F.2d 254 (7th Cir. 1983) ...................................................................................................... 12

*Harper-Wyman Co. v. Connecticut Gen. Life Ins. Co*,
  No. 86-cv-9595-HDL, 1991 WL 285746 (N.D. Ill. Dec. 23, 1991) ........................................ 12

*John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*,
  510 U.S. 86 (1993) ..................................................................................................................... 10

*LaRue v. DeWolff, Boberg & Assocs., Inc.*,
  552 U.S. 248 (2008) ..................................................................................................................... 3

**Statutes**

29 U.S.C. § 1001. ............................................................................................................................. 1

29 U.S.C. § 1002(21)(A)(i) ........................................................................................................... 11

29 U.S.C. § 1101(b)(2) .................................................................................................................. 12

**Other Authorities**

*2016 Recordkeeping Survey*, Plan Sponsor (June 2016), *available at*
  http://www.plansponsor.com/2016-Recordkeeping-Survey/ .................................................... 4

American Council of Life Insurers, *Life Insurers and Your State 2017: Colorado*,
  *available at* https://www.acli.com/Industry-Facts/State-Fact-Sheets/CO ............................... 6

American Council of Life Insurers, *Life Insurers Fact Book 2016* (2016),
  *available at* https://www.acli.com/-/media/ACLI/Files/Fact-Books-
  Public/2016LIFactBook.ashx?la=en ......................................................................................... 7

BrightScope & Investment Company Institute, *The BrightScope/ICI Defined
  Contribution Plan Profile: A Close Look at 401(k) Plans, 2014* (Dec. 2016),
  https://www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf ...................................................... 5

CNBC Online, "*The Big Risk Looming in Your Money Market Fund*" (Feb. 24, 2016) *available at* http://www.cnbc.com/2016/02/24/beware-you-may-lose-cash-in-your-money-market-fund.html ................................................................................ 8

Dep't of Labor, Information Letter to Jon W. Breyfogle (Jan. 6, 2004), *available at* http://www.dol.gov/ebsa/regs/ILs/i1010604.html ............................................................... 12

Insured Retirement Institute, *State of the Insured Retirement Industry, 2016 Review and 2017 Outlook* (Dec. 2016), *available at*: https://www.myirionline.org/docs/default-source/research/iri-state-of-the-insured-retirement-industry---2016-review-and-2017-outlook.pdf?sfvrsn=2 ....................... 5, 9

Investment Company Institute, *401(k) Plans: A 25-Year Retrospective* (Nov. 2006), *available at* http://www.ici.org/pdf/per12-02.pdf .......................................................... 4

Investment Company Institute, *2012 Investment Company Fact Book* (52nd ed. 2012), *available at* http://www.ici.org/pdf/2012_factbook.pdf ................................................. 4

Investment Company Institute, *2014 Investment Company Fact Book* (54th ed. 2014), *available at* http://www.ici.org/pdf/2014_factbook.pdf ................................................. 4

Investment Company Institute, *2017 Investment Company Fact Book* (57th ed. 2017), *available at* https://www.ici.org/pdf/2017_factbook.pdf ............................................... 4

John E. Gilliam *et al.*, *Determinants of Risk Tolerance in the Baby Boomer Cohort*, 8 J. Bus. & Econ. Res. 79 (2010) .................................................................................. 5

Rui Yao *et al.*, *Decomposing the Age Effect on Risk Tolerance*, 40 J. Socio-Econ. 879 (2011) ................................................................................................................................. 5

Sarah Holden and Michael Hadley, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses,* Investment Company Institute Research Fundamentals (Vol. 15, No. 7, Nov. 2006), *available at* http://www.ici.org/pdf/fm-v15n7.pdf .................................................................................. 5

U.S. Dep't of Labor, Employee Benefits Security Administration, *A Look at 401(k) Plan Fees* (revised Oct. 2010), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf .............................................................. 6

# IDENTITY AND INTEREST OF *AMICUS CURIAE*

As set forth in the accompanying motion for leave, this brief is being filed by the American Council of Life Insurers ("ACLI") as *amicus curiae* in support of the motion for summary judgment filed by defendant Great-West Life & Annuity Insurance Company ("Great-West").[1]

ACLI is the largest life insurance trade association in the United States, representing the interests of approximately 290 member companies operating in the United States and abroad. ACLI advocates in state, federal, and international forums for public policy that supports the industry marketplace and the 75 million American families that rely on life insurers' products for financial and retirement security. ACLI members offer life insurance, annuities, retirement plans, long-term care and disability income insurance, and reinsurance, representing 94 percent of industry assets, 93 percent of life insurance premiums, and 97 percent of annuity considerations in the United States. Most products sold by ACLI members in the group employee benefits market are purchased to fund benefits under plans subject to the requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* ACLI members' retirement-related business includes group annuities issued to employer-sponsored retirement plans like those involved in this case.

ACLI regularly participates as *amicus curiae* in litigation affecting its members and their customers. ACLI and its members have a substantial interest in the disposition of Great-West's

---

[1] ACLI states that no party's counsel authored this brief in whole or in part, and no party, its counsel, or other person contributed money intended to fund the brief's preparation or submission other than ACLI on behalf of its collective membership. ACLI notes that Great-West is not an ACLI member company.

motion for summary judgment. A ruling in Plaintiff's favor (which, ACLI respectfully submits, would be wrong as a matter of law) could dramatically affect the business operations of ACLI's member companies, altering their ability to offer a highly popular, guaranteed retirement savings vehicle. Such a result would in turn restrict the availability of these desirable investment options to more conservative retirement investors, or those simply seeking to balance their portfolios, to the detriment of millions of consumers saving for retirement through their employer-sponsored plans.

ACLI respectfully submits this brief to facilitate and inform the Court's decision.

## INTRODUCTION

This case is not solely of interest to the parties before the Court. The case is also of keen importance to the broader retirement services industry, retirement savers, and ERISA jurisprudence alike. It is the earliest-filed of several similar class action lawsuits directed at members of the life insurance industry that provide certain products and services to sponsors and participants of ERISA-governed retirement plans. The targeted life insurance companies offer principal-protected, guaranteed-rate investment options that are integral to their businesses and to their customers' plans. With the record now fully developed, this bellwether case is at the critical summary judgment stage. The Court's summary judgment decision is likely to have broad implications for the retirement plan services marketplace. Thankfully, the industry's and retirement investors' interests are aligned in relation to the important issues at stake.

In sum, a decision *rejecting* application of ERISA's "guaranteed benefit policy" exception to the guaranteed product at hand, or finding that the insurer acts as an ERISA fiduciary, would be a "lose-lose" for all interests. It would be injurious to a vitally important

2

segment of the retirement services industry. It would be contrary to ERISA jurisprudence. And, most importantly, it would be a bad omen for older and more risk-averse retirement investors.

These savers have increasingly turned to guaranteed, general account-backed annuity products – like Great-West's Key Guaranteed Portfolio Fund here – to protect the principal and accrued earnings of all or at least some portion of their retirement savings portfolios. Such retirement plan investment options have understandably become more popular since the 2008 world financial crisis, when their value was accentuated in stark contrast to both riskier, non-guaranteed investments and lesser-performing, low-volatility investments like money market funds. Because a ruling in Plaintiff's favor would likely force many annuity issuers to curtail offering these valuable guaranteed products in the group retirement market, savers would be left with fewer low-risk, low-volatility investment alternatives at a time when market volatility is high, interest rates remain historically low, and millions of Baby Boomers are approaching retirement. Again, this would be a bad outcome for all concerned. To make matters worse, Plaintiff's theory, if accepted, would turn longstanding principles of ERISA fiduciary liability on their heads.

## DISCUSSION

### I. The Defined Contribution Plan Market and the Beneficial Role of Life Insurer General Account Products

#### A. *The Emergence and Importance of Defined Contribution Plans*

As the traditional, employer-funded "defined benefit" pension plan continues to recede into the annals of American financial history, the employer-sponsored "defined contribution" plan continues to assume greater and greater importance as a retirement savings mechanism for American workers. *Cf. LaRue v. DeWolff, Boberg & Assocs., Inc.,* 552 U.S. 248, 255 (2008)

3

("Defined contribution plans dominate the retirement plan scene today."). This case involves a "401(k) plan," by far the most prevalent type of defined contribution retirement savings plan offered by private employers in the United States.[2] At the end of 2016, employer-sponsored defined contribution plans held an estimated $7 trillion in assets, $4.8 trillion of which were held by 401(k) plans.[3] This reflects a dramatic increase since as recently as 2011, when defined contribution plans held approximately $4.5 trillion in retirement assets, of which over $3 trillion were held by 401(k) plans.[4] Equally dramatic, the number of 401(k) plans has increased from approximately 30,000 in 1985 to approximately 510,000 by year-end 2015.[5]

During this time of remarkable growth in the utilization of employer-sponsored defined contribution plans, increasing numbers of workers are preparing for and entering retirement. By the end of 2016, approximately 24 million Baby Boomers were age 65 or older. The largest wave of Boomers – comprised of approximately 33 million people born between 1952 and 1959 – will

---

[2] The universe of defined contribution plans also includes "403(b) plans" available to employees of educational institutions and certain non-profit organizations, "457 plans" sponsored by state and local governmental entities, and other types of private-employer plans, such as profit-sharing plans, without 401(k) features. *See* Investment Company Institute, *2014 Investment Company Fact Book* (54th ed. 2014), *available at* http://www.ici.org/pdf/2014_factbook.pdf, at 129.

[3] *See* Investment Company Institute, *2017 Investment Company Fact Book* (57th ed. 2017), *available at* https://www.ici.org/pdf/2017_factbook.pdf, at 140.

[4] *See* Investment Company Institute, *2012 Investment Company Fact Book* (52nd ed. 2012) ("Factbook"), *available at* http://www.ici.org/pdf/2012_factbook.pdf, at 107, 110. In this context, the universe of defined contribution plan assets encompasses 403(b) plans, "457" government plans, and private employer-sponsored plans (including 401(k) plans). *Id.* at 107.

[5] *See* Investment Company Institute, *401(k) Plans: A 25-Year Retrospective* (Nov. 2006), *available at* http://www.ici.org/pdf/per12-02.pdf, at 3 (Figure 1, entitled "Changing U.S. Private-Sector Pension Landscape"); *2016 Recordkeeping Survey*, Plan Sponsor (June 2016), *available at* http://www.plansponsor.com/2016-Recordkeeping-Survey/ (table entitled "Total Assets, Plans, and Participants by Plan Type").

begin to retire in 2017.[6] This advancing cohort of soon-to-retire workers has created enormous financial product demand, while the group's risk tolerance, largely as a function of age, is generally perceived to be decreasing.[7] In light of these circumstances and other socioeconomic factors, the demand for low-risk, late-stage retirement savings products has never been stronger.

### B.  *The Role of Life Insurers in the Defined Contribution Plan Market*

Life insurers entered the defined contribution retirement plan services market decades ago. Life insurers were and are inherently well-qualified to serve the burgeoning market given their unique ability to administer large pools of assets for large numbers of people. Thus, insurers were quickly able to bring their administrative, technology, investment, and risk management expertise to bear on the market.[8]

---

[6] *See* Insured Retirement Institute, *State of the Insured Retirement Industry, 2016 Review and 2017 Outlook* (Dec. 2016), *available at*: https://www.myirionline.org/docs/default-source/research/iri-state-of-the-insured-retirement-industry---2016-review-and-2017-outlook.pdf?sfvrsn=2.

[7] *See, e.g.,* Rui Yao *et al.*, *Decomposing the Age Effect on Risk Tolerance*, 40 J. Socio-Econ. 879, 883-84 (2011); John E. Gilliam *et al.*, *Determinants of Risk Tolerance in the Baby Boomer Cohort*, 8 J. Bus. & Econ. Res. 79, 83-84 (2010).

[8] *See, e.g.,* Sarah Holden and Michael Hadley, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses,* Investment Company Institute Research Fundamentals (Vol. 15, No. 7, Nov. 2006), *available at* http://www.ici.org/pdf/fm-v15n7.pdf, at 3 (listing administrative and other services provided to plans and participants and noting that "[a]dministrative service providers also process each and every participant transaction"); BrightScope & Investment Company Institute, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014* (Dec. 2016), https://www.ici.org/pdf/ppr_16_dcplan_profile_401k.pdf, at 8 ("Employers choose from a range of providers for 401(k) plan recordkeeping. Insurance companies were the most common recordkeeper type for 401(k) plans, and were more likely to provide recordkeeping services for smaller 401(k) plans.").

Life insurers now administer approximately 20 percent of the multi-trillion-dollar defined contribution plan asset base.[9] From a structural standpoint, this administration is done primarily through the insurers' issuance of group annuity contracts to plan sponsor fiduciaries for the benefit of each plan and its participants. These group annuity platforms allow retirement plan participants to pool their retirement assets and choose from a menu of available investment options selected by their employer/plan sponsor fiduciary, often with the help of a third-party investment advisor. The life insurers administering the contracts then follow the participants' directions.[10]

### C. The Value and Corresponding Popularity of General Account Guaranteed Insurance Products

Typically (and as is the case in this litigation), employers choose to offer one or more "fixed interest" or "low-risk, low-volatility" options on their plan investment menus to accommodate individual participants' differing risk tolerances and financial circumstances and

---

[9] *See* American Council of Life Insurers, *Life Insurers and Your State 2017: Colorado*, *available at* https://www.acli.com/Industry-Facts/State-Fact-Sheets/CO (With respect to the national market, "[l]ife insurers are leading providers of retirement solutions, including 401(k)s, 403(b)s, 457s, IRAs, and annuities, managing 20 percent of all defined contribution plan assets and 14 percent of all IRA assets.").

[10] *See* U.S. Dep't of Labor, Employee Benefits Security Administration, *A Look at 401(k) Plan Fees* (revised Oct. 2010), *available at* http://www.dol.gov/ebsa/pdf/401kFeesEmployee.pdf, at 2 ("In recent years, there has been a dramatic increase in the number of investment options typically offered under 401(k) plans as well as the level and types of services provided to participants. These changes give today's employees who direct their 401(k) investments greater opportunity than ever before to affect their retirement savings.").

objectives. On this end of the risk/volatility spectrum, general account-supported guaranteed products are prevalent in defined contribution plans administered by life insurance companies.[11]

Within the overall menu of available investment options selected by the plan sponsor, these general account products offer retirement savers an attractive low-risk option that guarantees their principal and accrued earnings while offering stable ongoing earnings opportunities that generally outpace other fixed or low-volatility options such as bank certificates of deposit and money market funds. The insurance companies' obligations are backed by the general account assets and financial strength of the historically stable life insurers that offer them, as well as the state guarantee funds that back the insurers' obligations in the rare event of insurer insolvency.

Moreover, general account products allow retirement savers to accrue and lock in credited interest gains on top of their protected principal at a guaranteed rate declared in advance of the period to which the rate will apply. Thus, retirement investors bear no risk of loss or any other investment risk, and they know ahead of time what the fixed rate will be and how much in total their investments will earn over the guarantee period. In contrast, the insurer bears all downside investment risk due to its obligation to fund the declared-in-advance, guaranteed rate with its general account assets. The insurer also bears all liquidity risk and associated costs

---

[11] A life insurance company's "general account" refers to the insurer's own asset account that supports the insurer's company-wide contractual obligations to policyholders and beneficiaries for guaranteed, fixed-dollar benefit payments. *See* American Council of Life Insurers, *Life Insurers Fact Book 2016* (2016), *available at* https://www.acli.com/-/media/ACLI/Files/Fact-Books-Public/2016LIFactBook.ashx?la=en, at 7. Life insurers held $6.5 trillion in assets in 2015 ($4 trillion of which were general account assets), making insurers a significant source of investment capital in each state. *Id.* at 7, 83.

because participants have the unqualified right to remove all funds from their accounts immediately and without penalty.  Because plan participants can transfer funds from their fixed accounts at any time without penalty, participants have complete control over the decision to maintain their fixed account investments at the declared rate, or to move their funds elsewhere.  As such, the insurer does not have investment discretion or any other relevant authority or control over participants' account assets.

While the declared interest rate has always been higher, the credited rate for the Great-West product, from a contractual standpoint, can never be less than zero percent.  This backstop may not seem like a valuable financial promise.  It is.  The zero percent minimum interest guarantee can have substantial economic value under certain market conditions, particularly for risk-averse investors seeking to protect their retirement assets.  Of note, money market funds, at least on a global level, are seeing negative interest rates.  *See* CNBC Online, "*The Big Risk Looming in Your Money Market Fund*" (Feb. 24, 2016) (noting that more countries, including Japan recently, have introduced negative interest rates, and many investors fear that this could happen in the United States, which would negatively impact money market fund investors here), *available at* http://www.cnbc.com/2016/02/24/beware-you-may-lose-cash-in-your-money-market-fund.html.  If an investor's assets are exposed to a negative interest rate, the investor suffers a loss of principal.  A zero percent minimum interest rate guarantee eliminates any such risk of loss for the investor.  Instead, this risk is put on the insurer.

Not surprisingly, these positive product attributes have made general account-based plan investment options (and fixed annuity products generally) popular capital preservation

8

vehicles.[12] The broad availability of the products in the defined contribution plan marketplace has been a boon to investors, particularly those risk-averse investors who had funds in these products (and saw modest *gains*) during the 2008 financial crisis and subsequent global recession, while countless Americans' retirement nest eggs were decimated.

Unfortunately, if Plaintiff's ERISA liability theory were embraced, the marketplace would be severely disrupted and consumer choice in this critical area of retirement security would suffer. Expecting insurers to continue to bear all downside investment risk and liquidity risk associated with these guaranteed products, while precluding insurers from profiting from prudent management of their own investment portfolios if there is upside gain, is not economically desirable or sustainable. It would almost assuredly force insurers to discontinue offering and underwriting these products. Such a result would not serve the ultimate interests of the very retirement savers Plaintiff purports to represent. The elimination of general account products would mean that retirement investors would have to put their money into another product that has either market risk or a lower return. No risk-averse retirement saver would want that outcome.

---

[12] *See, e.g.,* Insured Retirement Institute, *State of the Insured Retirement Industry, 2016 Review and 2017 Outlook* (Dec. 2016), *available at*: https://www.myirionline.org/docs/default-source/research/iri-state-of-the-insured-retirement-industry---2016-review-and-2017-outlook.pdf?sfvrsn=2, at 6 ("Through the midway point of 2016, year-to-date sales of fixed annuities exceeded sales of variable annuities for the first time...").

## II. Insurers Offering General Account Guaranteed Products are Not ERISA Fiduciaries

### A. *Harris Trust Establishes that the Guaranteed Benefit Policy Exception Applies*

ACLI does not intend to repeat the cogent legal arguments advanced by Great-West regarding why it is entitled to summary judgment. ACLI agrees with Great-West's analysis and application of the Supreme Court's seminal decision in *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86 (1993), to the relevant facts before the Court. It is beyond dispute that Great-West provides "a genuine guarantee of an aggregate amount of benefits payable to retirement plan participants" through the group annuity product at issue. *See id.* at 106. As *Harris Trust* expressly prescribes, this guarantee results in an "allocat[ion of] investment risk to the insurer," thus establishing "guaranteed benefit policy" status. *Id.* Nor is this surprising: if one party is giving a guaranteed return and the other party is receiving a guaranteed return, it is always the "giver" who is at risk. Moreover, since there are no "free funds" associated with the Great-West contract because *all* funds and credited interest are *at all times* guaranteed and available, this ends the inquiry. *See id.* ("free funds" are "funds in excess of those that have been converted into guaranteed benefits").

Consistent with the appropriate standard under *Harris Trust*, Great-West's general account assets backing its guaranteed benefit policy obligations are not plan assets. Great-West owes no fiduciary duties to plans or participants in this respect.

### B. *Great-West Is Not Exercising Fiduciary Authority or Control Over Plan Assets*

Beyond the dispositive impact of *Harris Trust*, ACLI also briefly notes that other longstanding ERISA principles, jurisprudence, and Labor Department guidance make clear that insurers such as Great-West – that issue and administer the type of annuity product at issue in

10

this case – are not fiduciaries under ERISA because they simply are not exercising authority or control over a plan asset.

### 1. *The Great-West Key Guaranteed Portfolio Fund (the "Fund")*

A person is a fiduciary with respect to a plan to the extent he "exercises any authority or control respecting [the] management or disposition of its assets." 29 U.S.C. § 1002(21)(A)(i). An insurer such as Great-West is not a fiduciary with respect to each plan's contractual interest in the Fund (*i.e.,* the plan asset) because Great-West does not exercise any authority or control over the plan's interest when it prospectively resets the credited rate of interest on a periodic basis. No authority or control is "exercised" over any plan assets because the decision to either accept or reject the new rate rests entirely with the plan sponsor or, with respect to the claims in this case, the plan participants. When a new rate is declared in advance, participants are free to either keep their money in the Fund and receive the new interest rate, allocate additional money to the Fund, or transfer their money out of the Fund, without penalty.[13] Moreover, not only are interest rates for the Fund declared in advance, but, in addition: (i) each participant's principal is guaranteed and (ii) each participant's accrued interest, when added to the Fund, is guaranteed. These guarantees constitute the essence of a guaranteed insurance contract in which the insurer bears all risk of investment loss.

---

[13] Similarly, a plan sponsor can decide to terminate the relationship with Great-West and leave the Fund. In such a circumstance, the plan sponsor will receive the Fund balance within 12 months after giving notice of termination, without penalty.

### *2. General Account Assets*

ERISA provides that an insurer's assets are not plan assets to the extent a policy or contract issued by that insurer "provides for benefits the amount of which is guaranteed by the insurer." 29 U.S.C. § 1101(b)(2). Even prior to *Harris Trust*, courts consistently held that group annuity contracts that provide for guarantees of principal and rates of return guaranteed for fixed periods in advance constitute "guaranteed benefit policies." *See, e.g., Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.,* 713 F.2d 254, 260 (7th Cir. 1983); *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 729 F. Supp. 1162 (N.D. Ill. 1989), *aff'd,* 941 F.2d 561, 568 (7th Circ. 1991); *Harper-Wyman Co. v. Connecticut Gen. Life Ins. Co,* No. 86-cv-9595-HDL, 1991 WL 285746, at *4-5 (N.D. Ill. Dec. 23, 1991). The Labor Department has also taken the same position since *Harris Trust*. *See* Dep't of Labor, Information Letter to Jon W. Breyfogle (Jan. 6, 2004), *available at* http://www.dol.gov/ebsa/regs/ILs/i1010604.html.

Because the Fund is a guaranteed benefit policy, the assets underlying the Fund are not plan assets. Therefore, Great-West would not be exercising authority or control over plan assets in administering or managing its general account assets so as to make Great-West a fiduciary.

### III. Conclusion

For these reasons, as well as those set forth in Great-West's memorandum in support of its motion for summary judgment, the American Council of Life Insurers, as *amicus curiae*, respectfully submits that the Court should reject Plaintiff's theory of ERISA liability and grant Great-West's motion.

DATED: MAY 2, 2017                  AMERICAN COUNCIL OF LIFE INSURERS

By: *s/ Waldemar J. Pflepsen, Jr.*
    James F. Jorden\*
    Waldemar J. Pflepsen, Jr.\*
    CARLTON FIELDS JORDEN BURT P.A.
    1025 Thomas Jefferson Street NW
    Suite 400 West
    Washington, DC 20007
    Tel.: (202) 965-8100
    jjorden@carltonfields.com
    wpflepsen@carltonfields.com

    Michael A. Valerio
    John C. Pitblado\*
    CARLTON FIELDS JORDEN BURT P.A.
    One State Street, Suite 1800
    Hartford, CT 06103
    Tel: (860) 392-5000
    mvalerio@carltonfields.com
    jpitblado@carltonfields.com

    Lisa Tate
    AMERICAN COUNCIL
    OF LIFE INSURERS
    101 Constitution Avenue NW, Suite 700
    Washington, DC 20001
    Tel.: (202) 624-2153
    LisaTate@acli.com

    *Attorneys for Amicus Curiae*
    *American Council of Life Insurers*

    \* admitted in the United States District Court
    for the District of Colorado

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of May, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Tara A. Amin, tamin@sidley.com

Joshua Eugene Anderson, Janderson@sidley.com

Scot David Bernstein, swampadero@sbernsteinlaw.com, swampadero@aol.com

Mark B. Blocker, mblocker@sidley.com, efilingnotice@sidley.com, mark-blocker-8881@ecf.pacerpro.com, ariana.taylor@sidley.com

James Alton Bloom, jbloom@schneiderwallace.com

Joel Stephen Feldman, jfeldman@sidley.com, dvelkovich@sidley.com, efilingnotice@sidley.com, joel-feldman-8377@ecf.pacerpro.com

Matthew M. Gerend, mgerend@kellerrohrback.com, chopkins@kellerrohrback.com

Todd Franklin Jackson, todd@feinbergjackson.com, zhelstrom@lewisfeinberg.com

Mark T. Johnson, mjohnson@schneiderwallace.com, efilings@schneiderwallace.com

Jeffrey Lewis, jlewis@kellerrohrback.com

Robert Michael Little, bob.little@greatwest.com

Michael Craig McKay, mmckay@schneiderwallace.com, efilings@schneiderwallace.com, rmchugh@schneiderwallace.com

Erin M. Riley, eriley@kellerrohrback.com, chopkins@kellerrohrback.com

Todd Michael Schneider, tschneider@schneiderwallace.com

Edward Craig Stewart, stewart@wtotrial.com, powell@wtotrial.com, papsdorf@wtotrial.com

Daniel Robert Thies, dthies@sidley.com, efilingnotice@sidley.com, daniel-thies-5695@ecf.pacerpro.com

Nina Rachel Wasow, nina@feinbergjackson.com

Garrett W. Wotkyns, gwotkyns@schneiderwallace.com, efilings@schneiderwallace.com, egallegos@schneiderwallace.com

                                        *s/ Waldemar J. Pflepsen, Jr.*

111544762.3