# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02330-WJM-NYW

JOHN TEETS,

      Plaintiff,

v.

GREAT-WEST LIFE &
ANNUITY INSURANCE
COMPANY,

      Defendant.

---

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................... 1

II.  RESPONSE TO MOVANT'S MATERIAL FACTS ............................................. 3

III. STATEMENT OF ADDITIONAL DISPUTED fACTS ...................................... 11

IV. ARGUMENT ...................................................................................................... 17

    A.  Great-West Is a Fiduciary. .......................................................................... 17

        1.  Great-West Is a Fiduciary Because it Exercises Discretionary Control Over a Plan Asset—the Contract—and Over its Own Compensation. ................................... 17

        2.  Great-West's Fiduciary Status Is Not Negated by the Ability of Plans or Participants to Withdraw from the KGPF. ................................................ 20

        3.  The Guaranteed Benefit Policy Exemption Does Not Relieve Great-West of Fiduciary Status. ................................................ 23

            (i)  Great-West Mischaracterizes *Harris Trust* .................................... 24

            (ii) The KGPF Does Not Guarantee a Reasonable Rate of Return ...................... 26

            (iii)Investment Risk Is Borne Primarily by the Participants in the KGPF. ........... 28

            (iv)The Fact That Great-West Announces the Credited Rate in Advance of Each Quarter Does Not Make the KGPF a Guaranteed Benefit Policy. ........ 31

            (v)  Great-West's Management of its General Account Is Not at Issue. .............. 34

    B.  Plaintiff's Damages Theories Are Valid. ....................................................... 37

        1.  The GBP Exemption Does Not Preclude Plaintiff's Theory of Recovery ............. 37

        2.  Plaintiff's Third Claim for Relief Seeks "Appropriate Equitable Relief." ............. 38

V.  CONCLUSION ................................................................................................... 40

i

## I.  INTRODUCTION

Great-West cannot seriously dispute that it uses its discretionary authority to set the Credited Rate with an eye toward its own profit rather than the best interests of the retirement plan participants who invest in the KGPF. *See* Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion" or "Pl. MSJ"), ECF No. 175, at 23-28. Great-West seeks to avoid liability for its self-dealing by insisting that it is not a fiduciary. Its arguments boil down to two primary points: first, Great-West should bear no responsibility for setting the Credited Rate in its own pecuniary interest because plan-level fiduciaries choose to include the KGPF as a retirement plan investment and participants choose to invest in it; and second, Great-West is exempt from ERISA's fiduciary scheme because the KGPF Contract is a "guaranteed benefit policy."

The first argument fails because, under ERISA, a service provider with control over a plan's assets is a functional fiduciary with respect to its exercise of that control, regardless of a named fiduciary's ability to terminate the relationship with the service provider. Great-West is a fiduciary because it uses its discretionary control over the Contract to set the Credited Rate and, therefore, its own compensation. *See* Pl. MSJ 18-22. That participants decide to invest in, and have the ability to withdraw from, the KGPF does not change the analysis. Were it otherwise, essentially any investment provider would be insulated from fiduciary liability. Yet ERISA plainly contemplates, and numerous cases have concluded, that service providers are fiduciaries if they satisfy ERISA's functional fiduciary definition.

Great-West's second argument, regarding the guaranteed benefit policy ("GBP") exemption, also fails for several reasons. First, the exemption provides only that an insurer's general account assets will not be considered plan assets; it expressly recognizes that the policy

itself is a plan asset. Thus, by virtue of its control over the Contract (through setting the Credited Rate), Great-West exercises control over a plan asset and the exemption cannot absolve Great-West of fiduciary status. *See* Pl. MSJ 30-32.

Second, even if the GBP exemption were relevant to Plaintiff's claims, Great-West cannot meet its burden of proving this affirmative defense, *see* Pl. MSJ 28-29, because the undisputed evidence disproves an essential element—Great-West does not guarantee a reasonable rate of return. *See* Pl. MSJ 32-34. Contrary to Great-West's contentions, zero percent is not a reasonable guarantee, and the fact that the Credited Rate is announced a few days before the beginning of each quarter and participants can divest from the KGPF is not enough to bring the Contract within the scope of this "markedly confined" exemption. *See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank* ("*Harris Trust*"), 510 U.S. 86, 96 (1993).

Third, even if Great-West were correct that the only relevant element of the exemption is whether Great-West bore investment risk, the exemption still would not apply. The undisputed facts demonstrate that investment risk in the KGPF is borne primarily by plan participants. Great-West shifts the risk to participants by changing the Credited Rate in conjunction with both the yield on the portfolio of assets underlying the KGPF and changes in costs of managing the KGPF. As a result, Great-West's margin (the difference between the investment yield net of expenses and the Credited Rate) remains more or less stable. Further, Great-West employs a host of risk-management strategies, the costs of which it passes through to participants via a lower Credited Rate. Thus, the GBP exemption does not apply as a matter of law.

Finally, the Court should disregard Great-West's hyperbolic assertions that this case will destroy the stable value fund industry. It may well be that stable value products are desired by

some retirement plan investors and that some stable value products may offer rates of return that compare favorably with other investment options such as money market funds. But that is irrelevant. Plaintiff's claims do not pertain to the industry as a whole; they pertain to one specific product, the KGPF. Not all stable value products work like the KGPF. And neither the features of other stable value products nor the possible applicability of any ruling in this case to those products is before this Court. The task before this Court is to determine, based on the record, whether the features of the KGPF make Great-West a fiduciary under ERISA, and if so, whether Great-West breached its fiduciary duties and engaged in prohibited transactions. Great-West has offered no evidence whatsoever that a ruling in Plaintiff's favor would actually bring about the parade of horribles it envisions. Great-West's motion should be denied.

## II. RESPONSE TO MOVANT'S MATERIAL FACTS

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Denied in part. The KGPF is an investment product, not an insurance product.

*See, e.g.*, Ex. 1 at Table 1;[1] ECF No. 176-16 at p. 10[2] (showing that participants in the KGPF

---

[1] All exhibits are to the Declaration of Nina Wasow in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment. Exhibits are cited herein as "Ex. ___."
[2] Unless otherwise noted, all citations are to page numbers in the original document and not to page numbers marked by the ECF system.

share in Great-West's investment experience). *See also* ECF No. 172-3 (information sheet listing the Credited Rate as the "KGPF Investment Performance"). Otherwise admitted.

8.     Denied in part. The KGPF does not provide a yield higher than all other "low-volatility investments." *See, e.g.*, ECF No. 173-2 at GWL00221301. Plaintiff objects to the citation to the Donahue article as support for this asserted fact. The article is not "admissible evidence in the record," nor does it "establish[]" the asserted fact. Plaintiff also objects to the citation to the Expert Report of Laura Starks, ECF No. 179-55 at ¶¶ 32-39 as support for this fact, because Dr. Starks said nothing in those paragraphs about the KGPF specifically (and she stated that money market funds are "not directly comparable in terms of their returns, risk profiles, or costs" to stable value products). Otherwise admitted.

9.     Admitted.

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Admitted.

14.     Denied in part. The part of the Contract cited by Great-West simply provides that contributions can be allocated by a participant, not that they must be. ECF No. 179-1 at GWL00188293-94. Great-West does not cite to any admissible evidence establishing that it is always the participant's decision whether to allocate money to the KGPF. Otherwise admitted.

15.     Denied in part. A participant who chooses to withdraw money from the KGPF suffers a "penalty" in that he or she cannot maintain the same risk profile in his or her retirement plan account because Great-West prohibits plans that offer the KGPF from offering any

competing investment options. *See infra* Statement of Additional Disputed Facts ("AF") ¶ 26 and

evidence cited therein. Otherwise admitted.

16.     Admitted.

17.     Admitted.

18.     Admitted.

19.     Denied in part. The default "cessation option" under the Contract is the

"participant maintenance option," in which Great-West continues to hold participants' money in

the KGPF until it is all transferred or distributed by the participants. ECF No. 179-1 at

GWL00188299; ECF No. 176-4 (McLeod Dep. 44:18-45:11). Some plans are assessed a market

value charge if they elect to terminate the Contact and withdraw from the KGPF. Ex. 2 (McLeod

Dep. 45:24-46:6). Further, the Contract provides for a "Contract Termination Charge" if the

Contract is terminated before Great-West's recovery of all Start-Up Costs. ECF No. 179-1 at

GWL00188301. Otherwise admitted.

20.     Admitted.

21.     Admitted.

22.     Denied in part. The KGPF is an investment product, not an insurance product. *See*

*supra* ¶ 7. In addition, Great-West invests its general account to make a profit and earn returns

for its shareholders, not just to cover its liabilities. *See, e.g.*, Ex. 1 at 17-18; ECF No. 179-2

(McLeod Dep. 122:21-25). Otherwise admitted.

23.     Denied in part. Evidence in the record does not show that the insurance

companies with which Great-West compares itself are all of its competitors or that these

companies offer products which are properly characterized as "guaranteed insurance products."

*See* ECF No. 179-2 (McLeod Dep. 82:15-22, 84:3-17); Ex. 2 (McLeod Dep. 85:22-89:25) (discussing how Great-West obtains competitor information, and stating that what competitors' credited rates were doing "would be some indication as to what might be happening in their portfolios"); ECF No. 179-7 (Richman Dep. 78:18-79:15) (stating that companies with which Great-West compared itself were "competitors of Great-West" but "they may not offer similar products"). In addition, the evidence cited by Great-West does not show that Great-West has assets with "significantly" shorter duration than its competitors. Otherwise admitted.

24.    Denied. All of the KGPF promotional materials that Great-West cites as support state that they are for advisor, broker, and/or plan sponsor use only; several say explicitly "not for use with Plan Participants." *See, e.g.*, ECF No. 172-2. The witnesses whose declarations Great-West cites stated that Great-West's investment strategy is discussed in sales presentations to plan trustees and advisors; they said nothing about disclosure to participants. ECF Nos. 90, 93. Materials distributed to participants do not discuss Great-West's investment strategy or compare the KGPF Credited Rate to rates for other similar products. *See* Ex. 3 at P000034-44.

25.    Denied. Great-West does not bear any more than a negligible amount of the investment risk associated with the KGPF. AF ¶¶ 1-30; Pl. MSJ at MF ¶¶ 66-67. Great-West's quotes from Plaintiff's experts' reports and depositions are taken out of context; the experts actually opined that participants bear almost all of the investment risk associated with the KGPF. Dr. Kopcke explained that "because the remaining lives of most of the KGPF's bonds extend more than one quarter, the income from these bonds would not change, even if market rates of interest fell more than GW expected. The guarantee poses interest rate risk only on the bonds that mature each quarter …. Market interest rates must plunge substantially for the three-month

guarantee to impose any material cost on GW." Ex. 1 at 15. *See also* ECF No. 179-41 at 5-7;

ECF No. 176-7 (Pomerantz Class Dep. 160:2-18) (only "tail risk" remains with Great-West);

Ex. 4 (Pomerantz Class Dep. 177:20-178:10) (participants in the KGPF absorb fluctuations in

interest rates through the Credited Rate); Ex. 5 (Pomerantz Merits Dep. 68:19-69:19) (Great-

West only bears the risk of "some degree of variability" in the profit it will earn within each 90-

day period).

      26.    Denied in part. Admitted that these types of investment risk exist, but not that

Great-West "bears" them. ECF No. 179-41 at 2-3 ("[t]he KGPF already fully compensates GW

for the cost of defaults and GW's expense for managing default risk. Consequently, GW bears

negligible default risk."); *id.* at 9 (calling prepayment risk "negligible" because "[e]ven if

prepayments rise to 9 percent and interest rates fall 2 percentage points during a quarter once in

every 40 quarters – an extraordinarily high rate of prepayments, occurring extraordinarily

frequently – the cost of the resulting reinvestment and call risk is less than 0.1 of a basis point

per quarter, or 0.3 of a basis point per year."); *id.* at 4-8 (explaining Great-West's effective

measures to limit its own interest rate risk, the costs of which are imposed on KGPF participants,

and opining that the risk remaining with Great-West is worth approximately 5 bps). *See also*

Ex. 1 at 7-16; Ex. 14 at 1-3.

      27.    Denied. "Liquidity risk occurs when GW needs to sell securities for which there is

no ready market, causing GW to sell these assets at prices below the prices that it could obtain if

the securities were more marketable." ECF No. 179-41 at 8. But Great-West holds mostly

marketable securities. *Id.*; Ex. 6 (Tocher Dep. 110:19-111:13). "[T]he KGPF compensates GW

for th[e] investment management expense" associated with controlling liquidity risk and this risk

is "minimal." ECF No. 179-41 at 8-9. In addition, because plans that offer the KGPF are not

allowed to offer any competing investment options, participants who withdraw from the KGPF

must change the risk profile of their accounts; there is a strong disincentive to withdrawing

funds, so it is highly unlikely that participant withdrawals due to a lower Credited Rate would

force Great-West to sell assets to cover withdrawals. *Id.* at 5-6; ECF No. 179-55 at ¶¶ 37-38

(explaining that stable value products are attractive to older participants looking to "'lock in' all

or a portion of their retirement savings by investing in a capital preservation product").

28.     Denied in part. Dr. Kopcke opined that Great-West could hedge away its

remaining interest rate risk at a cost of 5-10 bps. Ex. 1 at 11-16.

29.     Admitted.

30.     Admitted.

31.     Denied in part. Farmer's Rice Cooperative chose investment options for its 401(k)

plan from a lineup that Great-West offered. ECF No. 171-1; ECF No. 171-2 at GWL00236520.

Otherwise admitted.

32.     Admitted.

33.     Denied in part. Great-West prohibits plan fiduciaries from offering both the

KGPF and other low-risk investment options. AF ¶ 26. Thus, the fiduciaries of the Farmer's Rice

Cooperative Plan did not have the ability to offer multiple investments "with little or no risk for

participants." Further, Plaintiff denies that the KGPF carries no risk for participants.

AF ¶¶ 30-34. Otherwise admitted.

34.     Denied in part. There is no evidence in the record as to the reasons that the

trustees of the Farmer's Rice Cooperative Plan selected the KGPF. Otherwise admitted.

35.     Admitted.

36.     Admitted.

37.     Admitted.

38.     Denied in part. Plaintiff's experts disagree that the decline in the Credited Rate during the recent period of prolonged low interest rates—or at least a decline to the extent experienced by participants in the KGPF—was necessary or inevitable. Ex. 1 at 25-26, Table 7 (discussing alternative credited rate calculation if Great-West had not double-counted expenses and retained excessive profit from the KGPF); Ex. 14 at 5-6 (showing that Great-West was able to maintain a stable margin, and decrease the percentage of portfolio yield credited to participants, during the class period which included a major financial crisis and recession); ECF No. 176-17 at 5-8 (showing Great-West's return on equity of at least 15% annually based largely on the KGPF margin). Otherwise admitted.

39.     Denied to the extent Great-West asserts that the instruments discussed are similar or comparable to the KGPF. CDs are not typically offered as investment options in defined contribution plans. *See, e.g.*, Deloitte, "Annual Defined Contribution Benchmarking Survey," https://www2.deloitte.com/us/en/pages/human-capital/articles/annual-defined-contribution-benchmarking-survey.html (2015), at 31-32 (listing common investment options, including stable value/GICs but not including CDs). Otherwise admitted.

40.     Denied to the extent Great-West asserts that the instruments discussed are similar or comparable to the KGPF. As Great-West's expert pointed out, there are "important differences" between money market funds and stable value funds, including the fact that money market funds "invest largely in shorter-term fixed income instruments" and stable value funds

are not regulated by the SEC. ECF No. 179-55 at ¶ 35. Otherwise admitted.

41.     Denied. There is no evidence in the record about the profit margins of other stable value funds, and it is not clear that Great-West's lower Credited Rate is a result of its conservative investment strategy as opposed to a higher profit margin (or some other reason—Great-West proffers no evidence about the specific features of the other funds). In addition, the chart at GWL00221303 is not specific to the KGPF; Great-West has not cited any evidence showing how the KGPF Credited Rate compares to other products with similar features or even evidence that there are such products. ECF No. 173-2 at GWL00221303.

42.     Admitted.

43.     Denied in part. Admitted that participants receive the Credited Rate. ███████

███████████████████████████████████████████████████████████████████

Pl. MSJ at MF ¶¶ 12, 27-28. And, if Great-West did not retain the entire margin in addition to the 89 bps Fund and Guarantee provision, the Credited Rate would be higher and thus participants' balances would be larger. Thus, Plaintiff denies that participant balances in the KGPF "are not reduced by any fees or charges" and that "Great-West does not charge participants to invest in the Fund." *See* Ex. 1 at 20-25; Ex. 14 at 9.

44.     Denied in part. Plaintiff admits that participants receive the Credited Rate, not the Credited Rate minus 89 bps. Plaintiff denies that the 0.89% Fund and Guarantee Provision does not "reduce" the Credited Rate, for the reasons stated in ¶ 43 above.

45.     Denied in part. Plaintiff admits that the Contract does not allow for an effective annual Credited Rate of less than 0%, and that participants receive the Credited Rate. Denied that the 0.89% Fund and Guarantee Provision does not "reduce" the Credited Rate, for the reasons

stated in ¶ 43 above.

## III. STATEMENT OF ADDITIONAL DISPUTED FACTS

A. <u>Great-West's Risk-Mitigation Measures.</u>

1.       Great-West invests the MLTN portfolio in high-quality bonds with average maturity of ███ years and effective duration of ███ years, including corporate bonds, asset-backed securities, mortgage-backed securities, corporate mortgage-backed securities, and commercial mortgages. ECF No. 173-2 at GWL000221295; Ex. 6 (Tocher Dep. 78:1-20, 91:10-92:10); Ex. 11 at GWL00033599.

2.       There are no provisions in the Contract requiring Great-West to invest the money contributed to the KGPF in any particular way. *See generally* ECF No. 179-1.

3.       The assets in the MLTN portfolio reliably repay 10-20 percent of their principal each year. ECF No. 179-41 at 6.

4.       Great-West limits defaults by purchasing investment-grade bonds, monitoring the condition of bond issuers, and diversifying its holdings. Ex. 7 at GWL00240791; ECF No. 179-4 (Tilley Dep. 180:13-181:9).

5.       ████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

6.       Great-West generally buys and holds assets until they mature and uses "hold to maturity" accounting. Ex. 6 (Tocher Dep. 127:10-21) ("we are buying assets for their characteristics that support the liabilities and the liability projections … our objective is to hold those securities and our net yield that we booked at purchase"). *See also* Ex. 8 (Friesen Dep.

26:16-20) (it is "very rare that we sell an asset."); ECF No. 179-41 at 7.

7.      Despite short-term fluctuations in the market value of assets, Great-West "can

anticipate the cash flow from the bonds it associates with the KGPF with a relatively high degree

of certainty" and "[a] large drop in the market price of bonds in one year will be offset by future

increases as the market prices of bonds converge to their face value at maturity."

ECF No. 179-41 at 7.

8.      Great-West manages assets and liabilities for the entire general account. Ex. 8

(Friesen Dep. 20:13-22, 27:11-24).



12.     Since most of the bonds in the MLTN portfolio will not mature within any given

quarter (and Great-West holds most bonds to maturity), the income from these bonds will not

change even if interest rates fluctuate in ways that Great-West had not anticipated. Ex. 1 at 15.

13.     For example, even if interest rates fell 2 percent within a quarter, the average

return on the KGPF's assets would fall only 3 bps – and this is a highly unlikely event. Interest

rates have dropped 1 percent or more within a quarter only once in the last 189 quarters. *Id.*



B.  Risk Management Through the Contract and its Administration.

20.     The Contract is standard across plans and is not negotiated with individual plan sponsors. Ex. 2 (McLeod Dep. 65:1-67:9).

21.     Plans that invest in the KGPF must give Great-West at least 60 days' advance written notice to terminate the Contract. ECF No. 179-1 at GWL00188302. Great-West can also terminate the Contract on 60 days' notice. *Id.*

22.     Great-West can also declare a "Contribution Cessation Date" on 90-days' notice to the plan, at which point no further contributions to the KGPF from the plan will be accepted. *Id.* at GWL00188294.

23.     The option to close the KGPF to new deposits gives Great-West several years to respond to collapsing interest rates and protects Great-West from liquidity risk. Ex. 1 at 16; Ex. 14 at 2.

24.     The "put option," under which Great-West can take up to 12 months from the time the Contract is terminated to pay out the book value of a Plan's investment in the KGPF, "allows GW to reduce its potential losses—and, therefore, its risk—by using the cash it receives from maturing bonds and other payments of principal to make its own payments on the KGPF's contracts." Ex. 1 at 9.

25.     The put option reduces the potential negative consequences to Great-West of a spike in interest rates. *Id.* at 11. Even if this option were not available to Great-West, the risk of "even a very large jump in interest rates" could be hedged at a cost of 5-10 bps and is "negligible." *Id.* at 12-14.

26.     Great-West does not permit plans that invest in the KGPF to offer any competing

funds, including any money market fund, any bond fund with a duration of three years or less, any stable value fund, "any fund with a known or periodically declared rate of interest," or "any other fund that GWL&A deems to be competing." Ex. 11 at GWL00033613.

27.    A participant who wishes to cease investing in the KGPF must move funds to a different asset class, such as stocks. *Id.*; ECF No. 176-4 (McLeod Dep. 51:5-52:25).

28.    Participants are disincentivized to transfer funds out of the KGPF, which helps Great-West ensure that there is not a "run on the bank." Ex. 4 (Pomerantz Class Dep. 179:6-18); ECF No. 179-41 at 5.

29.    The Contract's cessation provisions allow Great-West to protect its earnings and capital in a prolonged low interest rate environment. Ex. 1 at 16.

30.    Great-West's ability to change the Credited Rate quarterly allows Great-West to respond to changes in market interest rates by re-setting the Credited Rate. Ex. 1 at 15; ECF No. 179-41 at 7, 9; Ex. 14 at 1-2; ECF No. 179-4 (Tilley Dep. 161:23-14); Ex. 12 (Tilley Dep. 228:14-17).

C.    Reasonableness of the Credited Rate.

31.    The net investment yield on the MLTN portfolio has declined during the class period, from 5.48% to 2.92%. Ex. 1 at Table 1.

32.    The Credited Rate has declined along with the yield. *Id.*

33. The following graph shows that while the yield and the credited rate declined, Great-West's margin remained relatively stable. ECF No. 176-16 at 10.



34. The following graph shows that the Credited Rate also has declined as a percentage of the yield, as Great-West has kept an increasing proportion of the investment earnings from KGPF assets for itself. Ex. 14 at 6.



35. Expert economist Richard Kopcke opined that the Credited Rate has not been reasonable during the class period because Great-West double-counted expenses, withheld an excessive amount to cover its "Cost of Capital"—which was not proportional to the risk to Great-West from offering the KGPF—and thus received an "economic profit" in excess of its

opportunity costs. Ex. 1 at 20-25.

    **D.** <u>The Margin Is Undisclosed.</u>

36.      Materials provided by Great-West to plan sponsors, advisors, and participants do not disclose the amount of the margin retained by Great-West from the KGPF. ECF No. 172-1, 172-2, 172-3, 172-4, 179-46, 179-47; Ex. 3.

37.      These materials do not explain that there is a margin, or that the margin is how Great-West makes money on the KGPF. *Id.*

38.      Great-West has a policy of not disclosing its revenue or profit from the KGPF. Ex. 13 (Moritz Dep. at 129:17-130:10, 131:18-132:9).

## IV. ARGUMENT

**A.**      **Great-West Is a Fiduciary.**

     Because there is no genuine dispute that Great-West, by virtue of its discretion to set the Credited Rate, possessed and exercised discretionary control over both a plan asset (the Contract) and its own compensation, Plaintiff is entitled to judgment as a matter of law that Great-West is a fiduciary with respect to its setting of the Credited Rate. *See* Pl. MSJ 18-22. Great-West is therefore bound to act in the sole interest of participants who invest in the KGPF and may not engage in self-dealing.

     **1.**      **Great-West Is a Fiduciary Because it Exercises Discretionary Control Over a Plan Asset—the Contract—and Over its Own Compensation.**

     Great-West states that "a party does not act as an ERISA fiduciary in determining what investment products or other products or services to make available to plan clients or when it negotiates the terms under which it is willing to offer those products or services." Mot. 16. This argument misses the point. Plaintiff's claims do not pertain to Great-West's decision to offer the

KGPF as an investment product to retirement plans or its negotiation of the Contract (though, notably, the Contract is the same from plan to plan; its terms are, essentially, non-negotiable). First Amended Complaint, ECF No. 47 ("FAC") at ¶¶ 39, 48; AF ¶ 20. Plaintiff's claims pertain to Great-West's exercise of control over the Contract *after* it is entered into by the plans. Plaintiff asserts that Great-West satisfies ERISA's functional definition of a "fiduciary" because setting the Credited Rate is an exercise of control over the management of the Contract, which is a plan asset. *See* Pl. MSJ 18-21. Great-West's discretionary authority to set the Credited Rate gives it control over its own compensation, and it is a fiduciary for that reason as well. Pl. MSJ at 21-22.

The cases cited by Great-West actually support Plaintiff's argument. *See* Mot. 16-17, 32-33. In *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127, 1131-32 (7th Cir. 1983), the court held that a health insurer was not a fiduciary when it set premiums charged to an ERISA plan because the premiums were established prior to entry into any agreement with the plan, so the insurer did "not exercise discretionary authority with respect to the setting of rates." Here, in contrast, the Credited Rate is not set by the Contract or by any formula set by the Contract. Pl. MSJ at MF ¶¶ 10, 26. There is no dispute that Great-West had and exercised complete discretion over the Credited Rate, subject only to the contractual guarantee that that it would not be lower than zero. *Id.* The court in *Seaway Food Town, Inc. v. Med. Mut. Of Ohio*, 347 F.3d 610, 618-19 (6th Cir. 2003), recognized that "[w]hen a contract … grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary." *Id.* at 618 (quoting *Ed Miniat, Inc. v. Globe Life Ins. Grp. Inc.*, 805 F.2d 732, 737 (7th Cir. 1986)). Further, where a contract gives a service provider to an ERISA plan "control over factors that determine the actual amount of its compensation," the service provider is a

fiduciary with respect to that compensation. *Id.* at 619 (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1259 (2d Cir. 1987)). The court in *Seaway* concluded that the insurer was not a fiduciary because the contract at issue, unlike here, did not grant any discretionary authority to the insurer.[3] After its decision in *Seaway*, the Sixth Circuit returned to the issue in *Pipefitters Local 636 Insurance Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861, 867 (6th Cir. 2013) ("*Pipefitters*"). There, the Sixth Circuit held that the insurer/service provider was a fiduciary because the contract "in no way cabins Defendant's discretion to charge or set the … fee" and, as such, "Defendant necessarily had discretion in the way it collected the funds to defray its [costs]." *Id.* Because the Contract gives Great-West discretion to reset the Credited Rate quarterly, the analysis in *Seaway* and *Pipefitters* supports the conclusion that Great-West was a fiduciary with respect to the Credited rate. *See* Pl. MSJ 20-21.

Finally, *Hecker v. Deere & Co.*, 556 F.3d 575 (7th Cir. 2009) also does not support Great-West's argument about its fiduciary status. The claims in *Hecker* involved the selection of plan investment options and the defendant service provider had authority only to recommend, not select, those options. For that reason the Seventh Circuit found that the service provider did not have "discretion to select the funds for the Plans." *Id.* at 583. Here, Great-West does not *recommend* a credited rate that plan fiduciaries then accept—Great-West *sets* the Credited Rate at its own discretion. Other plan fiduciaries have no ability to approve or change that Rate. Great-West has final authority over the Rate that will apply for each 90-day period. Thus, it is a

---

[3] The contract at issue in *Seaway* explicitly stated that a welfare plan's claims administrator would retain certain funds for its own benefit. The court held that adherence to this contractual term did not render the administrator a fiduciary. *Seaway*, 347 F.3d at 619. Here, conversely, the Contract does not specify that Great-West may retain the margin for its own benefit. The Contract does not mention the existence of a margin at all. AF ¶¶ 36-38.

fiduciary. *Haddock v. Nationwide Fin. Servs.*, 419 F. Supp. 2d 156, 184 (D. Conn. 2006) (holding that the service provider qualified as a fiduciary because it "had the authority to delete and substitute mutual funds from the plan without seeking approval from the named fiduciary").

### 2. Great-West's Fiduciary Status Is Not Negated by the Ability of Plans or Participants to Withdraw from the KGPF.

Great-West asserts that it does not exercise control over the Credited Rate because plans can discontinue offering the KGPF and plan participants can withdraw from the KGPF at any time. Thus, Great-West claims, it does not have the "final say" over whether the Credited Rate will apply to a participant and so it cannot be considered a fiduciary. Mot. 32-33. Great-West's position is contrary to ERISA's fiduciary provisions, which place fiduciary responsibility on *any* entity that exercises control over plan assets and which recognize that there can be more than one fiduciary of a plan. It is also contrary to caselaw recognizing service providers as fiduciaries.

Great-West's argument, taken to its logical conclusion, would mean that a service provider with discretionary control over a plan investment, including complete discretion to control the rate of return on that investment, would *never* be an ERISA fiduciary so long as another fiduciary selected—or had the authority to remove—the investment option from the plan. This is not the law. In addition to ERISA's provisions regarding a "named fiduciary"—*i.e.*, the fiduciary named in every plan instrument who must have "authority to control and manage the operation and administration of the plan," 29 U.S.C. § 1102—ERISA also contains a functional definition of "fiduciary," *see* 29 U.S.C. § 1002(21)(A), pursuant to which a plan's service providers, even if selected by the plan's named fiduciary, indisputably can qualify as fiduciaries. *See also* 29 U.S.C. § 1105 (an ERISA fiduciary "shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" under certain

circumstances). Further, Great-West's argument is contradicted by numerous cases finding that service providers qualify as ERISA fiduciaries if they exercise control over plans or plan assets.[4] Such cases would have been wrongly decided if Great-West's argument—that a service provider is exempt from fiduciary status merely because a plan's named fiduciary has authority to remove the service provider—were the law, since there is no indication that any of them involved contracts in which fiduciaries had given up the authority to terminate the service providers.

The fact that other fiduciaries selected and may remove the KGPF as an investment similarly does not exempt Great-West from fiduciary status. *See, e.g.*, *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213, 1225 (N.D. Cal. 2008) (ERISA service provider "cannot hide behind the [named fiduciary's] oversight to shield itself from possible liability over its own actions .... Accordingly, [the service provider] was a fiduciary ....").[5]

Great-West's argument about participants' ability to withdraw from the KGPF suffers from the same flawed logic. As Great-West frames the issue, it is only a fiduciary if it has the "final say" in whether a proposed term (here, a new Credited Rate) "governs a participant's investment," and if a participant can abandon the KGPF altogether, Great-West does not have the "final say." Mot. 32. Great-West does not cite to a single case supporting its contention that a service provider to an individual account defined contribution plan can avoid fiduciary status

---

[4] *See, e.g.*, *Pipefitters*, 722 F.3d at 867 (insurance company); *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 303-04 (D. Mass. 2013) (investment provider); *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1218 (2d Cir. 1987) (investment manager); *Martin v. Feilen*, 965 F.2d 660, 669 (8th Cir. 1992) (accountants); *Reich v. Lancaster*, 55 F.3d 1034, 1049 (5th Cir. 1995) (insurance agent).

[5] Great-West's argument also ignores the limitations on a plan's ability to discontinue offering the KGPF. Doing so entails giving Great-West notice and waiting up to 12 months to complete withdrawal of the funds in the KGPF, selecting an alternative capital-preservation investment option, and communicating that decision to participants. AF ¶¶ 21, 24.

merely because participants have the ability to invest in or divest from the product offered by the service provider, and Plaintiff is aware of no such case. Great-West's only citation is to *Hecker,* 556 F.3d at 583, but that case said nothing about whether an investment provider can be a fiduciary with respect to a product from which participants have the right to withdraw.

Moreover, Great-West completely ignores the ERISA provision that expressly addresses the limited circumstances under which fiduciaries may avoid liability for losses caused by participants' exercise of control over their accounts. ERISA § 404(c)(1), 29 U.S.C. § 1104(c)(1).[6] Even if Great-West had not waived a section 404(c) defense,[7] Great-West cannot meet its substantive requirements. Great-West's breach—setting the Credited Rate in its own interest—was not the "direct and necessary result" of participants' exercise of control. 29 C.F.R. § 2550.404c-1(d)(2)(i). And, although § 404(c) may absolve fiduciaries of liability if a participant fails to diversify or otherwise loses money as a result of his allocation of assets among the plan's investment options, fiduciaries are still liable if the investment options from which participants choose fail to comply with ERISA's requirements (including the duty of loyalty). *See, e.g., Howell v. Motorola, Inc.,* 633 F.3d 552, 567 (7th Cir. 2011).[8]

---

[6] "If a participant … exercised control over the assets in his account" then "no person who is otherwise a fiduciary shall be liable … for any loss, or by reason of any breach, which results from such participant's … exercise of control…." 29 U.S.C. § 1104(c)(1). Detailed regulations address the applicability of § 404(c)(1). *See* 29 C.F.R. §§ 2550.404c-1 & 2550.404c-5.

[7] Section 404(c) is an affirmative defense as to which a fiduciary bears the burden of proof. *Allison v. Bank One-Denver,* 289 F.3d 1223, 1238 (10th Cir. 2002). Great-West did not plead § 404(c) as an affirmative defense in its Answer, and the defense is therefore waived. Fed. R. Civ. P. 8(c)(1); Wright & Miller, Federal Practice & Procedure § 1278 (2017 Online Ed.).

[8] Moreover, the § 404(c) defense requires that participants be "provided … the opportunity to obtain sufficient information to make informed investment decisions," including detailed and accurate fee disclosures. 29 C.F.R. §§ 2550.404c-1(b)(2)(i)(B), 2550.404a-5. Great-West's fee disclosures do not even mention that Great-West retained the margin from the KGPF; on the

Finally, practical considerations weigh against relieving Great-West of fiduciary liability on the basis that participants can divest from the KGPF. Because Great-West precludes plans from offering alternative low-risk investments alongside the KGPF, participants who divest from the KGPF in response to a change in Credited Rate are forced to alter the risk profile of their retirement accounts. AF ¶¶ 26-27. Further, Great-West's argument presupposes that participants will engage in risky and burdensome active management of their accounts every quarter when Great-West changes the Credited Rate. The barriers to exercising the contractual right to divest are significant, and it does not make sense to treat participants as the true decision makers.

In sum, the Court should reject Great-West's arguments that it lacks sufficient control over the Contract to be a fiduciary under ERISA.

### 3.     The Guaranteed Benefit Policy Exemption Does Not Relieve Great-West of Fiduciary Status.

Great-West's argument that it cannot be a fiduciary if the Contract qualifies as a guaranteed benefit policy is wrong and entirely ignores the narrow purpose of the GBP exemption. Mot. 17-18, 33-36. The GBP exemption provides only that the assets of an insurer's general account will not be "deemed" to be plan assets. 29 U.S.C. § 1101(b)(2). Critically, the exemption also expressly recognizes that the policy, here the Contract, itself "shall be deemed" a plan asset. *Id.* Because Great-West exercises discretionary control over the Contract each time it sets the quarterly Credited Rate, and the Contract is a plan asset, Great-West is a fiduciary. *See*

---

contrary, they suggest that Great-West received 0.89% out of the return on the KGPF assets through the "Fund and Guarantee Provision." AF ¶¶ 36-37; Pl. MSJ at MF ¶¶ 51, 55. In reality, Great-West received between two and three times that much in every quarter during the class period. Pl. MSJ at MF ¶ 70 (and evidence cited). This is fatal to a defense under § 404(c)(1). For the same reasons, Great-West's assertion that it adequately disclosed the "key features of the Fund" is false. Mot. 35-36.

29 U.S.C. § 1002(21)(A)(i); Pl. MSJ 30-32. Even if the exemption applied—and thus Great-West were not held to ERISA's fiduciary standards with respect to its management of those general account assets that are purchased with contributions to the KGPF—Great-West is still a fiduciary with respect to its management of the Contract.

Moreover, the GBP exemption—an affirmative defense for which Great-West bears the burden of proof, *see* Pl. MSJ 28-29—does not apply because Great-West cannot prove its essential elements: the Contract neither provides a "genuine guarantee of an aggregate amount of benefits," nor "guarantee[s] … a reasonable rate of return." *Harris Trust*, 510 U.S. at 106. Thus, the Contract does not "allocate[] investment risk" to Great-West. *Id.* Great-West's announcement of the Credited Rate in advance of each quarter does not remedy these deficiencies.

### (i)      Great-West Mischaracterizes *Harris Trust*.

Great-West contends that the Court "need not determine whether the Fund's rate of return was reasonable" because the KGPF differs from the specific type of contract at issue in *Harris Trust*. Mot. 19-24. Great-West contends that *Harris Trust* identified "two alternative tests," and that the "reasonable rate of return" requirement applies only if a product does not "guarantee 'benefits.'" Mot. 20. The better reading of *Harris Trust* is that it sets out one simple test: a contract is a guaranteed benefit policy if it allocates investment risk primarily to the insurer rather than to the participants. A contract component that provides a "genuine guarantee of an *aggregate amount of benefits*" clearly allocates risk to the insurer. For a contract component that does not provide such a guarantee, the "key" "indicator" of whether investment risk is allocated to the insurer is whether the contract provides a "guarantee of a reasonable rate of return." 510 U.S. at 106. In any event, whether *Harris Trust* articulates a one-factor or two-factor test is

immaterial, because the Contract at issue in this case fails either way. *See infra* pp. 28-31.

Although *Harris Trust* addressed two different contractual components (a guaranteed fixed annuity and so-called "free funds") and did not subject the fixed annuity to the "reasonable rate of return" analysis, that is because there was no dispute that the fixed annuity provided a guaranteed benefit—i.e., that the insurer offering the fixed annuity bore the investment risk. *Harris Trust*, 510 U.S. at 106. Because it was not clear whether the insurer bore the investment risk with respect to the "free funds," the Court questioned whether there was a "guarantee of a reasonable rate of return" that shifted risk from participant to insurer. *Id.* Great-West's contention that *every* product offered by an insurance company should be treated as if it were a fixed annuity—and thus should be spared the reasonable rate of return analysis—so long as it does not have any components that "fluctuate in value," *see* Mot. 21-22, cannot be reconciled with the Supreme Court's instruction that the GBP exemption is to be interpreted "narrowly" and "closely contain[ed]." *Harris Trust*, 510 U.S. at 97.

Yet even if Great-West were correct that the Court must consider whether the KGPF Contract is more analogous to the free funds or the fixed annuity in *Harris Trust*, the answer is clearly the former. A three-month promise to pay a Credited Rate that is reset in the sole discretion of Great-West (subject only to a contractual floor of 0%) is not similar to the fixed annuity in *Harris Trust*, which provided a specified monthly benefit and was unchanged by the underlying investment returns earned by the insurer. The amount a participant in the KGPF will receive upon retirement is not fixed or predictable (at least not more than 90 days into the future) because the rate of return on funds invested in the KGPF can fluctuate—and has fluctuated— over time at Great-West's sole discretion. Great-West's actions in setting the Credited Rate every

quarter unquestionably impact how much money participants have in the KGPF, and thus necessarily "affect the amount of benefits retirement plan participants will receive." *Id.* at 96. Accordingly, *Harris Trust* compels the Court to consider whether Great-West has guaranteed a "reasonable rate of return" before it may conclude that the KGPF is a guaranteed benefit policy.

### (ii)    The KGPF Does Not Guarantee a Reasonable Rate of Return.

Selectively quoting (Mot. 15, 18) the Order denying its Motion to Dismiss, Great-West skips over this Court's observation that certain of *Harris Trust*'s factors (including that courts must "consider whether a 'reasonable rate of return' is guaranteed") "militate against applying GBP exemption" here. *Teets v. Great-West Life & Annuity Ins. Co.*, 106 F. Supp. 3d 1198, 1203 (D. Colo. 2015) (quoting *Harris Trust*, 510 U.S. at 106). As explained in Plaintiff's Motion, Great-West's unfettered discretion to re-set the Credited Rate every quarter, and to reduce it as low as zero percent, means that there is no reasonable "guaranteed" rate of return under the Contract. Pl. MSJ 32-34.

Great-West contends that the Credited Rate is reasonable because it is "comparable to the rates on similar general account products in the market throughout the class period" and exceeded the rates on CDs and two-year Treasury securities. Mot. 29. But Great-West offers no authority to support the proposition that the correct measure of "reasonableness" is comparability to the rates offered by "similar" products.[9] The case it cites, *Jones v. Harris Associates L.P.*, 611 Fed. Appx. 359 (7th Cir. 2015), considered whether an investment advisor's *fees* violated section 36(b) of the Investment Company Act. Under *Harris Trust* it is the reasonableness of the

---

[9] The products with which Great-West compares the KGPF are dissimilar to the KGPF in various respects. *See supra* Response to Defendant's Statement of Material Facts ¶ 23, 39-41.

*guaranteed rate* that is at issue, and Great-West's *compensation*, although related to the Credited Rate, is analytically distinct. Again, the "guarantee of a reasonable rate of return" is an "indicator" that the contract "allocates investment risk to the insurer." 510 U.S. at 106. The question the Court must ask is whether the guaranteed Credited Rate for the KGPF is high enough to shift investment risk to Great-West. *See Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.*, 941 F.2d 561, 566 (7th Cir. 1991) (noting that the Supreme Court's opinions on the § 3(a)(8) exemption to the Securities Act do not say "[h]ow much risk is too much" but hold that "a low minimum rate of return" "will not do the trick"). A zero minimum guaranteed rate and the right to participate in Great-West's investment experience (*after* Great-West extracts its own profits) does not effectively transfer risk to Great-West such that the Credited Rate is "reasonable" as that term is used in *Harris Trust*.

Great-West protests that the Court should not look at the minimum guaranteed rate, but instead at the Credited Rate actually paid in each quarter. Mot. 29-30. But the minimum rate is crucial to the risk allocation: Great-West's ability to take the Credited Rate down to zero within 90 days of the occurrence of any market event that might affect its capital or profit means that it bears almost no investment risk (particularly in view of its ability to terminate the Contract on 60-days' notice and to delay payouts of plan balances for up to 12 months). AF ¶¶ 23-24, 29-30; Pl. MSJ at MF ¶¶ 65-67. The promise to preserve principal is extremely unlikely to cost Great-West anything. *Id.*[10] Accordingly, Plaintiff is entitled to summary judgment that the KGPF is not a guaranteed benefit policy because the KGPF does not guarantee a reasonable rate of return—

---

[10] It is irrelevant that other types of investments do not guarantee principal. Mot. 30-31. The question before the Court is not whether the KGPF is less risky than other investments, but rather whether participants or Great-West primarily bear the investment risk of the KGPF.

and thus does not allocate risk to Great-West.

Even if the Court looks to the Credited Rate actually paid and not the minimum guaranteed rate, Plaintiff's expert opined that the Credited Rate was unreasonable in every quarter in the class period. AF ¶ 35. He noted that Great-West set the Credited Rate at such a low level that the remaining margin retained by Great-West far exceeded the cost of any risk assumed by Great-West—and thus far exceeded any *value* added by Great-West—which necessarily means the Credited Rate was not reasonable. *Id*. Great-West could have recouped the expenses of offering the KGPF and compensated itself for the nominal risks it takes in offering the KGPF (via a cost of capital as appropriately defined), for approximately 23 bps. Pl. MSJ at MF ¶¶ 62-64, 66; Ex. 1 at Table 7. Instead it collected a margin of, on average, 249 bps. ECF No. 179-59 at Table 1. A reasonable Credited Rate would not shift nearly all of Great-West's investment risk to participants as it did. Thus, Great-West is not entitled to summary judgment on the reasonableness of the Rate.

### (iii) Investment Risk Is Borne Primarily by the Participants in the KGPF.

The guaranteed benefit policy exception does not apply if investment risk "is borne *primarily* by the contractholder." 510 U.S. at 103 (emphasis added). An insurance contract with a "fixed payout" places investment risk primarily on the insurer; a contract under which participants' contributions are turned over to the insurer "to manage with full investment discretion, subject only to a modest income guaranty," does not. *Id*. (quoting *Peoria Union Stock Yards Co. Ret. Plan v. Penn. Mut. Life Ins. Co*., 698 F.2d 320, 327 (7th Cir. 1983)). The Supreme Court further explained that the requisite risk transfer has not occurred if "benefit payments vary with the success of the [insurer's] investment policy." *Id*. at 102 (quoting *SEC v. Variable*

*Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 69 (1959)). In that situation, the contract serves "primarily an investment, rather than an insurance, function." *Id.*[11]

With this framework in mind, it is clear that the KGPF is not a true "insurance" arrangement. Participants' interest payments vary with the success of Great-West's investment policy. One need only look at the trajectories of the Credited Rate and margin during the class period to see that Great-West passes its investment experience through to participants—the Credited Rate fell as the yield on investments in the MLTN portfolio fell, while Great-West "milked" the KGPF for a relatively stable and robust margin. AF ¶¶ 31-34; Pl. MSJ at MF ¶ 44-48. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████ Great-West's shareholders have seen consistent returns on equity of over 15%, while the Credited Rate paid to KGPF investors has fallen by nearly 70%. *Id.* at MF ¶¶ 44, 46, 74.

Further, it is clear that contributions to the KGPF are turned over to Great-West to manage with only a modest income guarantee, if that. Great-West can invest money in the MLTN portfolio as it sees fit—there are no investment guidelines built into the Contract—and is obligated only to preserve participants' principal and pay an unspecified credited rate that it can

---

[11] These authorities considered whether contracts were covered by § 3(a)(8) of the Securities Act, 15 U.S.C. § 77c(a)(8), which exempts "[a]ny insurance or endowment policy or annuity contract or optional annuity contract" from the Act's registration requirements. If a contract is not an "annuity" within the meaning of § 3(a)(8), it is also not a guaranteed benefit policy within the meaning of ERISA. 510 U.S. at 101-102. *See also Adolescent Psychiatry*, 941 F.2d at 568.

change every 90 days. AF ¶ 2; Pl. MSJ at MF ¶¶ 9-10.

Great-West employs a variety of risk-management measures, including conservative portfolio management and the purchase of hedges, and passes the costs of such measures on to participants through reduction of the earned rate (from which the Credited Rate is set). AF ¶¶ 1-19; Pl. MSJ at MF ¶¶ 12, 27-28, 65. It also passes through asset default costs. AF ¶ 5; Pl. MSJ at MF ¶¶ 12, 28, 42. Great-West also protects itself through Contract provisions that strongly discourage both plans and participants from exiting the KGPF while maintaining Great-West's ability to close the KGPF to new deposits and/or terminate the Contract on short notice. AF ¶¶ 21-29. Ordinary interest rate fluctuations do not affect Great-West's capital or profits, ███████████ ██████████████████████████████████████████████████████████████████. AF ¶¶ 6-7, 12-18, 23-25, 28-29. Plaintiff's experts have opined that the risk remaining with Great-West is "negligible" and valued it at no more than 20 bps. Response to Defendant's Statement of Material Facts ¶¶ 25-27; Pl. MSJ at MF ¶ 66. Great-West's experts have not attempted to place a value on the risk Great-West faces as a result of its contractual guarantees. Pl. MSJ at MF ¶ 68. It is undisputed, however, that Great-West discloses a "Guarantee Provision" of 54 bps to cover the costs of its guarantees, and that it uses a "guarantee premium" of 30 bps in setting the Credited Rate. *Id.* at ¶¶ 55, 67. The margin is far larger than 30-54 bps, so Great-West is more than compensated for any risk in offering the KGPF.

Great-West essentially argues that it is entitled to the GBP exemption because it retains some marginal risk to its profits, and in the rarest of circumstances some risk to its capital (for instance, the risk of a very sudden and catastrophic spike in interest rates). Mot. 25-26. But the exemption does not apply when the insurer bears *any* risk; it applies only when the risk is borne

*primarily* by the insurer. That is what *Harris Trust* says, and the alternative would mean the exception swallows the rule. Essentially all contractual arrangements between insurers and employee benefit plans leave *some* risk with the insurer—the business of insurance is managing and spreading risk. *See, e.g.*, *Met. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 743 (1985). Thus, if the guaranteed benefit policy exemption applied to any contract where the insurer bears even a modicum of risk, nearly every contract would fall within the exemption, a result which would be contrary to the letter and spirit of *Harris Trust*. 510 U.S. at 96-97.

The evidence shows that the KGPF serves an investment function, not an insurance function, and that investment risk resides largely with the participants. At the very least, there are genuine disputes of material fact regarding whether Great-West primarily bears the investment risk associated with the KGPF. Thus, Great-West cannot meet its burden of proving that the guaranteed benefit policy exclusion applies as a matter of law.

### (iv)   The Fact That Great-West Announces the Credited Rate in Advance of Each Quarter Does Not Make the KGPF a Guaranteed Benefit Policy.

Great-West recycles the argument from its Motion to Dismiss that any contract issued by an insurer, even if it provides for changes in the interest rate, qualifies as a guaranteed benefit policy so long as the changes to the interest rate are announced in advance. Mot. 26-28. Great-West relies on the same authorities—*Adolescent Psychiatry* and the "Breyfogle Letter." Neither authority supports Great-West's argument, and the Court should reject it.

The plan in *Adolescent Psychiatry*, as in *Harris Trust*, was a defined benefit plan; the sponsor made contributions under a contract that provided an annual rate of return of 7% for the first year, 6% for the next two years, 5% for the following two years, and 4% after that, *plus* a variable excess rate that was "declared annually" and was "derived from the rate of return …

earned on its general investment portfolio." 941 F.2d at 564, 566-67.[12] The insurer "neither

claimed nor exercised the power to change rates after accepting funds." *Id*. at 567. As a result,

and because the rate was declared before plans had to decide whether to contribute, withdraw,

and/or "roll over" previously-contributed funds, the contract did not "place excessive investment

risk on the purchaser" and thus was an "annuity" under the Securities Act. *Id*. at 567-68.

     Great-West contends that whether the guaranteed rate was reasonable was not relevant to

the decision in *Adolescent Psychiatry*, Mot. 27, but the Court should reject this cramped reading

of the case. The *Adolescent Psychiatry* court was centrally concerned with the distribution of

investment risk between the insurer and the policyholder. It examined the Supreme Court's

§ 3(a)(8) jurisprudence and noted that the exemption does not apply to an instrument "permitting

purchasers to share in the performance of an investment portfolio with a guaranteed but low

minimum rate of return." 941 F.2d at 566. The court was satisfied that the risk was shifted to the

insurer—such that the contract at issue was sufficiently similar to a "fixed annuity"—only after

looking at the whole picture: an annual guaranteed rate of return (which at its lowest was 4% and

thus was well in excess of 0%) plus an excess rate that was derived from the rate of return on the

general account (without any indication that the insurer retained a substantial margin), combined

with the plan's ability to withdraw if the rate was unsatisfactory.[13] There is no indication in the

---

[12] Great-West's statement that the contract in *Adolescent Psychiatry* "did not provide any minimum or floor rate" is wrong. Although there was no minimum "excess rate," plans that entered into the contract would receive at least the guaranteed rate, which was substantially greater than zero. 941 F.2d at 564.

[13] The court in *Adolescent Psychiatry* nonetheless held that the insurer was a functional fiduciary, because the contract itself was a plan asset and the insurer had discretionary authority over that instrument. 941 F.2d at 568. The court found based on the facts at hand that there was no breach of fiduciary duty, but the case supports Plaintiff's argument that Great-West is subject to ERISA's fiduciary standards based on its control over the Contract.

case that the contract provided for a delayed payout or bar on investing in competing products. The court held that the product was analogous to a series of one-year fixed annuities. *Id.* at 567.

The KGPF Contract bears almost no resemblance to a fixed annuity or to the contract at issue in *Adolescent Psychiatry. See Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104 (2d Cir. 2001) (explaining that an annuity is a contract "whereby the annuitant purchases the right to receive a stream of periodic payments" and "[f]or traditional or 'fixed' annuities," "[t]he contract will specify the amount of interest that will be credited to the annuitant's account as well as the amount of payments to be received under the contract."). Unlike the minimum annual guarantee of at least 4% in *Adolescent Psychiatry*, the guaranteed rate of return here is 0%. The Credited Rate changes quarterly rather than annually, and does not merely reflect Great-West's investment experience, but also reflects Great-West's desired profits and target shareholder earnings. AF ¶¶ 31-34; Pl. MSJ at MF ¶¶ 32-39. The Contract provides that plans may not withdraw funds immediately (but rather must wait up to 12 months to be paid out the full value of their accounts) and precludes plans from offering competing products, meaning that participants who withdraw must do so at the cost of foregoing a certain investment strategy. In other words, unlike the contract at issue in *Adolescent Psychiatry*, the Contract here places investment risk primarily on participants. *Supra* pp. 28-31. The fact that the Credited Rate is announced before it goes into effect and participants can stop investing in the KGPF—albeit at a considerable cost—simply is not enough to push the Contract over the line into "annuity" territory.

Further, Great-West's incomplete quotation of the Breyfogle Letter is very misleading. The Letter states that "group annuity contracts … *that provide for reasonable rates of return*

(taking into account any fees and costs charged against the contract), guaranteed for fixed

periods" would "appear to constitute 'guaranteed benefit policies.'" ECF No. 177-4. The

Breyfogle Letter does not support the proposition that a guaranteed benefit policy may offer *any*

rate of return so long as it is announced in advance. Further, the Letter states that "no

presumption should be drawn, from the limited interpretive guidance provided by this letter,

regarding the status of other insurance policies under section 401(b)(2) of ERISA." *Id.*

Taking Great-West's argument to its logical end-point, a contract that allowed a re-set of

the credited rate *daily*, or even more frequently, would be a guaranteed benefit policy, no matter

what the minimum rate, so long as the rate was announced at some point before it became

effective. This cannot be, and is not, the law, so perhaps it is not surprising that Great-West

largely ignores the authorities interpreting the GPB exemption post-*Harris Trust*. *See, e.g.*,

*Moreland v. Behl*, 1996 WL 193843, at *5–7 (N.D. Cal. Apr. 17, 1996); *Rapides Reg'l Med. Ctr.*

*v. Am. United Life Ins. Co.*, 938 F. Supp. 380, 389 (W.D. La. 1996).

Even if the Court need not address the reasonableness of the Credited Rate, Great-West

cannot show that it bears primary investment risk under the Contract or that the Contract

provides for a "genuine guarantee of an aggregate amount of benefits." *Harris Trust*, 510 U.S.

at 106. Thus, the GBP exemption does not apply.

### (v)    Great-West's Management of its General Account Is Not at Issue.

Great-West argues that treating it as a fiduciary based on its control over the Credited

Rate would be tantamount to imposing fiduciary standards on its management of its general

account. Mot. 33-36.  As an initial matter, Great-West's suggestion that the GBP exemption was

intended to isolate all insurer general account activity from ERISA's fiduciary duties, *see*

Mot. 17, 33-34 (citing *Mogel v. UNUM Life Ins. Co. of Am.*, 547 F.3d 23, 27 (1st Cir. 2008)),

was considered and rejected by the Supreme Court in *Harris Trust*. 510 U.S. at 101 ("a plan's

deposits are not shielded from the reach of ERISA's fiduciary prescriptions solely by virtue of

their placement in an insurer's general account"). *See also id.* (noting that Congress had before it,

but declined to pass, a version of the GBP exemption that "would have excluded all general

account assets from the reach of the fiduciary rules."). Nonetheless, Plaintiff does not claim that

Great-West breached its fiduciary duties by making poor investment decisions with general

account assets which caused the yield to decline. Instead, Plaintiff's claim is that Great-West

breached its duty by exercising its discretionary control in divvying up the investment yield

between itself and participants in the KGPF in its own interest (i.e., by setting the Credited Rate

to maximize or maintain its own profits).

Contrary to Great-West's contention, this Court did not previously hold that Great-West

could be a fiduciary only if its general account assets were plan assets. Mot. 33. Rather, the

Court recognized that "the GBP exemption is not a complete exemption from application of

ERISA; when a plan participant invests in a GBP, the policy or contract itself is an asset of the

plan." *Teets*, 106 F. Supp. 3d at 1201. The Court did not foreclose the conclusion that setting the

Credited Rate constitutes control over the management of a plan asset.

Putting Great-West's reading of the Court's previous ruling aside, Plaintiff's theory of

fiduciary liability is completely consistent with the text and purpose of the GBP exemption. The

exemption expressly differentiates between the contract itself and the underlying assets. ERISA

§ 401(b)(2), 29 U.S.C. § 1101(b)(2) ("the assets of such plan shall be deemed to include such

policy"). Great-West argues that the Court should simply wipe that distinction out of the statute,

such that if the GBP exemption applies, control over the contract itself would no longer be a fiduciary act. No court has ever adopted that rule, and several have rejected it outright. *See* Pl. MSJ at 20-21 (citing, *e.g.*, *Ferry v. Mut. Life Ins. Co. of N.Y.*, 868 F. Supp. 764 (W.D. Pa. 1994)).

If the GBP exemption applies, an insurer's investment choices regarding which bonds to buy, what duration, what amount of risk those bonds contained, etc., are not subject to ERISA's fiduciary duties. That is a significant protection which, as the Supreme Court explained in *Harris Trust*, should apply only when risk is truly shifted to the insurer. But even then, how to divide up the returns from that investment strategy (which is necessitated by Great-West's retention of discretion over the Credited Rate) is a separate question, not "inextricably" linked to the investment strategy as Great-West claims (with no support). Mot. 34.

Great-West was not required to retain the unilateral discretion to re-set the Credited Rate every 90 days. Had Great-West chosen to forgo such discretion, it would likely not have been a fiduciary of the plans at all. For example, Great-West could have designed the Contract such that the Credited Rate was set by a formula, or by reference to a defined benchmark. Indeed, Great-West's own expert recognized that many stable value products operate in just that way. ECF No. 179-40 at 8-9. Great-West could have hired an independent fiduciary to make a discretionary decision about the credited rate. Taking any of these steps would not have prevented Great-West from investing the assets in its general account as it saw fit to maintain its credit rating and satisfy state law requirements.

In a burst of hyperbole, Great-West states that treating its control over the Credited Rate as a fiduciary act would have "dramatic" consequences and "if Plaintiff's theory were correct, the GBP exception would cease to exist, and no insurance company could offer a product to

retirement plans with a guaranteed return." Mot. 34. This assertion applies to a broad spectrum of products with dissimilar features that are grouped under the loose heading of "stable value," and is not supported by a shred of evidence that all, most, or even many of such products would fail "Plaintiff's proposed test." *See* ECF No. 176-14 at 10 (Great-West's expert calling comparison of different types of stable value funds "naïve," and "potentially misleading"). Indeed, Great-West entirely ignores products such as fixed annuities in which insurers do not have ongoing discretion over the ultimate value of the benefit. And Great-West ignores that, as discussed above, there are several ways that an insurer can retain the right to periodically re-set a credited rate without exposing itself to fiduciary status. In any event, the effect of litigation on an industry or type of product is not this Court's responsibility. The law, when applied to the facts here, supports the conclusion that Great-West's control over the Contract renders it a fiduciary of the plans that invest in the KGPF, notwithstanding the GBP exemption.

**B.      Plaintiff's Damages Theories Are Valid.**

**1.      The GBP Exemption Does Not Preclude Plaintiff's Theory of Recovery.**

Great-West nowhere denies that, if it is a fiduciary, it breached its duties by setting the Credited Rate in its own interest, *see* Pl. MSJ 23-28. Instead, Great-West argues that even if it is a fiduciary (and, presumably, even if there was a breach), it still cannot be liable for its breaches because, according to Great-West, "Plaintiff has not demonstrated any cognizable damages resulting from such alleged control." Mot. 36-37. Great-West is mistaken.

As an initial matter, Great-West entirely ignores that Plaintiff seeks not only damages, but also disgorgement of profits earned by Great-West as a result of its fiduciary breach. *See* FAC ¶¶ 2, 40, 57; *id.* at 12-14 (Prayer for Relief). Nonetheless, contrary to Great-West's

contention, Plaintiff and the Class have suffered the same amount of losses regardless of whether the GBP exemption applies (i.e., regardless of whether the assets in Great-West's general account qualify as plan assets). Specifically, had Great-West exercised its discretion over the Credited Rate "solely in the interest" of plan participants, 29 U.S.C. § 1104(a)(1), instead of setting the Credited Rate based on its own profit and the target returns of its shareholders, the Credited Rate would have been higher. Great-West's exercise of discretion was fiduciary in nature regardless of whether that discretion was granted by contract, and regardless of the fact that participants had the option—albeit at the expense of pursuing a different investment strategy—of divesting from the KGPF. *See supra* pp. 17-23; Pl. MSJ 20-22. Thus, Plaintiff and the Class are entitled to the Credited Rate that would have been set by a fiduciary acting solely in the interest of plan participants.[14] ERISA § 409, 29 U.S.C. § 1109. *See also Eaves v. Penn*, 587 F.2d 453, 462-63 (10th Cir. 1978). The precise calculation of this rate—and thus the amount of damages and profits to be disgorged—is a factual issue that can more appropriately be addressed at trial. *See* Pl. MSJ at 38.

### 2. Plaintiff's Third Claim for Relief Seeks "Appropriate Equitable Relief."

As explained in Plaintiff's Motion, Great-West is liable for participation in prohibited transactions that violated ERISA § 406(a), even if Great-West is not a fiduciary. Pl. MSJ at 28.

---

[14] Such an outcome would have nothing to do with the purpose of the GBP exemption. *Contra* Mot. 37. The fiduciary discretion and breach at issue here have nothing to do with management of Great-West's general account and instead relate solely to Great-West's discretionary control over the Credited Rate—a feature which is not essential to a stable value product, *see supra* p. 36—and Great-West's exercise of that discretion in pursuit of its own pecuniary interests. Because this discretion directly reduced the benefits payable to Plaintiff and the Class, imposing fiduciary liability is fully consistent with the Supreme Court's statement that ERISA's fiduciary standards are "commodiously imposed ... on persons whose actions affect the amount of benefits retirement plan participants will receive." *Harris Trust*, 510 U.S. at 96.

*See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 248-49 (2000) (holding that a nonfiduciary may be held liable for knowing participation in a prohibited transaction under section 406(a)). Accordingly, Plaintiff seeks relief in the form of disgorgement of profits under ERISA § 502(a)(3), which provides that an ERISA plan participant may file suit "to obtain other appropriate equitable relief … to redress" violations of ERISA. 29 U.S.C. § 1132(a)(3). Great-West is incorrect in arguing that Plaintiff does not seek "appropriate equitable relief" merely because disgorgement of profits is monetary in nature. Mot. 37-39.

The phrase "appropriate equitable relief," as used in section 502(a)(3), encompasses "those categories of relief that were *typically* available in equity" including "injunction, mandamus, and restitution." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993).[15] Such typical equitable relief includes disgorgement of ill-gotten gains (which is also known as an "accounting for profits"). *See, e.g.*, *Salomon Smith Barney*, 530 U.S. at 250; *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 n.2 (2002) ("an accounting for profits" is "a form of equitable restitution"); *Edmonson v. Lincoln Nat. Life Ins. Co.*, 725 F.3d 406, 419-20 (3d Cir. 2013) ("claim for disgorgement, which is akin to an accounting for profits, is an equitable remedy available under ERISA …"); *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 365 (4th Cir. 2015).

Although Great-West cites *Knudson* for the proposition that suits seeking monetary relief are "almost invariably … suits for money damages," 534 U.S. at 210, the Supreme Court recognized exceptions to this rule, including equitable liens and constructive trusts, and further noted that "an accounting for profits" (i.e., *disgorgement*) is "a form of equitable restitution."

---

[15] "Flexibility is inherent in equitable remedies," and equitable relief should be awarded "with reference to the facts of the particular case." *Kansas v. Nebraska*, 135 S. Ct. 1042, 1058 (2015) (internal citations omitted).

*id.* at 214 n.2. Great-West also ignores that the Supreme Court subsequently explained that "the fact that … relief takes the form of a money payment does not remove it from the category of traditionally equitable relief." *CIGNA Corp. v. Amara*, 563 U.S. 421, 441 (2011).

Moreover, unlike the remedies of equitable lien or constructive trust that were considered in *Knudson*, *see* Mot. 37-38,[16] disgorgement of profits does not require the recovered funds to be traceable to a *res* or particular funds. *See Knudson*, 534 U.S. at 214 n.2 ("accounting for profits" is available "even if [plaintiff] cannot identify a particular res containing the profits sought to be recovered."); *Edmonson*, 725 F.3d at 419; *Pender*, 788 F.3d at 365. To the extent *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 579 F.3d 220, 238 (3d Cir. 2009) held otherwise, it is contrary to *Knudson*—the very case on which it relies—and thus is not persuasive authority. Indeed, the Third Circuit subsequently clarified that disgorgement is an "exception to the general principles established in *[Knudson]*," such that a claim of disgorgement does not require tracing. *Edmonson*, 725 F.3d at 419.

Accordingly, because Plaintiff is entitled to judgment as a matter of law that Great-West is liable for violations of ERISA § 406(a), *see* Pl. MSJ 28, Plaintiff is entitled to "appropriate equitable relief" in the form of disgorgement of Great-West's ill-gotten gains.

## V. CONCLUSION

Plaintiff respectfully requests that the Court deny Great-West's Motion in its entirety.

---

[16] *See also Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Gerber Life Ins. Co.*, 771 F.3d 150, 155 (2d Cir. 2014) (addressing restitution, equitable liens, and constructive trusts rather than disgorgement). Defendant also misconstrues *Haviland v. Metro. Life Ins. Co.*, 876 F. Supp. 2d 946, 965 (E.D. Mich. 2012). The language it quotes regarding "traceable funds" related to a claim for a constructive trust, not disgorgement. *Id.* Although plaintiffs in that case also sought disgorgement, that claim was dismissed on other grounds. *Id.* at 964.

Dated: May 23, 2017

Respectfully submitted,

By: _/s/ Nina Wasow_
      Nina Wasow

Todd F. Jackson
FEINBERG, JACKSON, WORTHMAN &
WASOW LLP
383 4th Street, Suite 201
Oakland, California 94607
Telephone: (510) 269-7998
Facsimile: (510) 269-7994
todd@feinbergjackson.com
nina@feinbergjackson.com

Scot Bernstein
LAW OFFICES OF SCOT D. BERNSTEIN,
A PROFESSIONAL CORPORATION
101 Parkshore Drive, Suite 100
Folsom, California 95630
Telephone: (916) 447-0100
Facsimile: (916) 933-5533
swampadero@sbernsteinlaw.com

Erin Riley
Matthew Gerend
KELLER ROHRBACK LLP
1201 Third Avenue, Suite 3200
Seattle, Washington 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
eriley@kellerrohrback.com
mgerend@kellerrohrback.com

Todd Schneider
Mark Johnson
James Bloom
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
tschneider@schneiderwallace.com
mjohnson@schneiderwallace.com
jbloom@schneiderwallace.com

Garrett W. Wotkyns
Michael McKay
SCHNEIDER WALLACE
COTTRELL KONECKY WOTKYNS LLP
8501 N. Scottsdale Rd., Suite 270
Scottsdale, Arizona 85253
Telephone: (480) 428-0145
Facsimile: (866) 505-8036
gwotkyns@schneiderwallace.com
mmckay@schneiderwallace.com

Jeffrey Lewis
KELLER ROHRBACK LLP
300 Lakeside Drive, Suite 1000
Oakland, California 94612
Telephone: (510) 463-3900
Facsimile: (510) 463-3901
jlewis@kellerrohrback.com

**_Attorneys for Plaintiff_**

## CERTIFICATE OF SERVICE

I certify that on May 23, 2017, a copy of the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will send notification to the following:

Joel Stephen Feldman, jfeldman@sidley.com

Mark B. Blocker, mblocker@sidley.com

Daniel Robert Thies, dthies@sidley.com

Edward Craig Stewart, stewart@wtotrial.com


*/s/ Nina Wasow*
Nina Wasow