**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-2330-WJM-NYW

JOHN TEETS,

      Plaintiff,

v.

GREAT-WEST LIFE & ANNUITY INSURANCE COMPANY,

      Defendant.

---

## ORDER ON PENDING MOTIONS

---

Plaintiff John Teets ("Plaintiff") brings this lawsuit against Defendant Great-West Life & Annuity Insurance Company ("Defendant") for Defendant's alleged breaches of its various duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* The Court has certified this lawsuit as a class action encompassing all participants in, and beneficiaries of, certain retirement plans that had invested in a particular stable-value fund offered by Defendant (described in detail below). *See Teets v. Great-West Life & Annuity Ins. Co.*, 315 F.R.D. 362, 374 (D. Colo. 2016) ("*Teets II*"). Generally speaking, Plaintiff claims that Defendant has profited from this fund in a manner that violates ERISA.

Currently before the Court is Defendant's Motion for Summary Judgment (ECF No. 181 (public entry); ECF No. 169 (supporting brief under Restricted Access)), and also Plaintiff's Motion for Partial Summary Judgment (ECF No. 182 (public entry); ECF No. 175 (supporting brief under Restricted Access)). Defendant has filed an unopposed

motion for oral argument on the parties' motions for summary judgment.  (ECF

No. 217.)  The Court finds, however, that the parties' six merits briefs, along with a

submission of supplemental authority (ECF No. 241), an amicus brief (ECF No. 178-1),

and a response to the amicus brief (ECF No. 208), are more than enough to assist the

Court in making its decision.  Thus, the oral argument motion will be denied.

As for the motions themselves, Defendant's will be granted and Plaintiff's denied

for the reasons explained below.  The fourth pending motion in this case, Defendant's

Motion to Decertify Class (ECF No. 180 (public entry); ECF No. 164 (supporting brief

under Restricted Access)), will accordingly be denied as moot.[1]

## I.  FACTS

The following facts are undisputed unless attributed to a party, or otherwise

noted.

Plaintiff, a California resident, was a participant in the Farmers' Rice Cooperative

401(k) Savings Plan ("Plan"), a retirement plan sponsored by the Farmer's Rice

Cooperative.  (ECF No. 169 at 11, ¶¶ 1–2.)[2]  The Plan contracted with Defendant for

Defendant's recordkeeping, administrative, and investment services.  (*Id.* at 17, ¶ 30.)

---

[1] Most of the briefs and exhibits filed in support of or opposition to the various motions have been filed under Restricted Access.  In this order, the Court has endeavored to respect trade secrets.  Nonetheless, having weighed the parties' confidentiality interests against the public's right of access, the Court finds that any Restricted material quoted or summarized below does not qualify for Restricted Access to the extent quoted or summarized, particularly given the need to provide a proper, publicly available explanation of the Court's decision.  *See* D.C.COLO.LCivR 7.2; *cf. Lucero v. Sandia Corp.*, 495 F. App'x 903, 913 (10th Cir. 2012) ("The strongest arguments for [public] access [to court records] apply to materials used as the basis for a judicial decision of the merits of the case, as by summary judgment." (internal quotation marks omitted)).

[2] All ECF page citations are to the page number in the ECF header, which does not always match the document's internal pagination, particularly in documents with prefatory material such as a table of contents.

The named fiduciaries of the Plan ("Plan Fiduciaries"), who are not parties to this lawsuit, selected the investment options available to Plan participants such as Plaintiff. (*Id.* ¶ 32.)  The Plan Fiduciaries selected, in total, twenty-nine investment options with a variety of risk and return characteristics.  (*Id.* ¶ 33.)

One of the investment options made available to Plaintiff and other Plan participants, and in which Plaintiff invested, was the Great-West Key Guaranteed Portfolio Fund ("Fund").  (*Id.* at 18, ¶ 34.)  As the Fund's full name suggests, it is operated by Defendant.  (*Id.* at 12, ¶ 7.)  Formally speaking, the Plan entered into "a Group Fixed Deferred Annuity Contract" ("Contract") with Defendant, which establishes the terms on which Defendant offers the Fund to, and administers contributions to the Fund for, the Plan and its participants.  (ECF No. 175 at 7, ¶ 2; *see generally* ECF No. 179-1.)  The major features of the Fund, as provided for in the Contract, are as follows:

- A guarantee to preserve principal and, once earned, interest.  (ECF No. 169 at 12–14, ¶¶ 8–9, 13, 16.)

- An interest rate, not to drop below 0%, that Defendant determines ahead of each coming quarter and then guarantees for the duration of that quarter ("Credited Rate").  (*Id.* ¶¶ 9–10, 12; ECF No. 179-1 at 15.)

- No fees or charges assessed against participants who withdraw any portion of their Fund balances (principal and/or accrued interest) at any time, including in the middle of a quarter.  (ECF No. 169 at 13–14, ¶¶ 15–16.)

- The Plan's ability to leave the Fund (*i.e.*, cease to offer it as an investment option to participants) without any surrender charge or market-value penalty, with the caveat that Defendant can delay transferring the Plan's Fund balance to the Plan for up to one year. (*Id.* at 14, ¶ 19.)[3] During this one year, Plan participants may still withdraw their individual balances without fees or charges. (*Id.*)

In addition, although apparently not required by the Contract, Defendant has always announced the coming quarter's Credited Rate two business days in advance of that quarter. (*Id.* at 12, ¶ 11.)

Defendant has always fulfilled the Fund's guarantees. Investors have never suffered a loss of principal on their monies allocated to the Fund, and Defendant has always credited Fund participants with the Credited Rate. (*Id.* at 14, ¶¶ 17–18.) During the time period relevant to this lawsuit, the Credited Rate has been as high as 3.55% and as low as 1.1%. (*Id.* at 18, ¶ 38.)

Although every Plan participant invested in the Fund owns his or her individual Fund balance, participants' contributions are not maintained in segregated accounts. Rather, Defendant deposits those contributions into its general account, *i.e.*, the account from which it satisfies all obligations to holders of all policies, be they traditional life insurance policies, investment contracts such as the Fund, or otherwise. (*Id.* at 14–15, ¶¶ 21–22.) Defendant invests its entire general account in fixed income instruments and seeks to earn a return on those investments. (*Id.* ¶ 22.)

---

[3] Plaintiff notes that some retirement plans offer the Fund with a contract rider that allows the plan to terminate and obtain the entire plan balance immediately, subject to a market value charge. (ECF No. 193 at 7, ¶ 19 and cited evidence.) No party points to such a rider in the Contract at issue here.

Fund contributions are considered a part of what Defendant calls the "MLTN portfolio," which is not a separate account but rather "an 'internal allocation of assets'" that Defendant uses to track the yield on investments made with Fund contributions and contributions to related products.  (ECF No. 175 at 7–8, ¶¶ 7–8.)  Defendant attempts to earn revenue for itself on the MLTN portfolio.  (*Id.* at 8, ¶ 15.)

After deducting expenses of offering the portfolio products, the Credited Rate is the most significant factor in determining whether Defendant will realize revenue for itself on the MLTN portfolio.  (*Id.* ¶ 13.)  This revenue—the difference between the portfolio's net investment yield and the Credited Rate—is known as the "margin" or the "spread."  (*Id.* ¶ 14.)  Defendant sets the Credited Rate with an eye toward the margin it will earn based on that Credited Rate (*id.* at 12, ¶ 37), although it considers other factors as well, such as competitors' rates and other budget targets (*id.* at 13–14, ¶¶ 40, 43).

Although apparently not a feature of the Contract, Plaintiff claims that Defendant in practice prohibits retirement plans that offer the Fund from offering any fund that Defendant deems to be competing, such as another stable-value fund.  (ECF No. 193 at 16, ¶ 26.)

## II.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v.*

*Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if

the evidence is such that it might lead a reasonable trier of fact to return a verdict for the

nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

      In analyzing a motion for summary judgment, a court must view the evidence and

all reasonable inferences therefrom in the light most favorable to the nonmoving party.

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita*

*Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the

Court must resolve factual ambiguities against the moving party, thus favoring the right

to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

### III.  ANALYSIS

      Plaintiff asserts three claims for relief.  Claims One and Two are inapplicable to

Defendant unless Defendant is an ERISA fiduciary.  (*See* ECF No. 47 ¶¶ 34–49.)  Claim

Three is potentially applicable regardless of whether Defendant is an ERISA fiduciary.

(*See id.* ¶¶ 50–57.)  Plaintiff has moved for summary judgment on the question of

liability as to all three claims, and has also moved against all of Defendant's affirmative

defenses, leaving only damages for trial.  Defendant has cross-moved for summary

judgment on all three of Plaintiff's claims.

      The analysis below will first address whether Defendant is an ERISA fiduciary

(Part III.A), and then whether Defendant may still be liable as a nonfiduciary (Part III.B).

### A.    Fiduciary Liability (Claims One and Two)

     1.    <u>The GBP Exception</u>

        a.    *In General*

      At the center of Claims One and Two is the allegation that Defendant failed to

comply with ERISA's requirements for fiduciaries of plan assets.  Under ERISA, a

person is a "fiduciary with respect to a[n employee benefit] plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets * * * or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).  A fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and * * * for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan . . . ." *Id.* § 1104(a)(1)(A).

Defendant's primary summary judgment argument is that it is not a fiduciary with respect to the Fund because ERISA contains an exemption for a "guaranteed benefit policy" ("GBP"), meaning "an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer."  29 U.S.C. § 1101(b)(2)(B).  The GBP exemption itself reads as follows: "In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer."  *Id.* § 1101(b)(2).  Defendant believes that Fund investments satisfy the GBP exemption, and so, in Defendant's view, it has no fiduciary responsibility toward Plaintiff when administering the Fund.

For reasons explained below, Defendant is correct that the Fund is a GBP. However, Defendant vastly overstates the scope of the GBP exemption.  Thus, the Fund's status as a GBP turns out to be irrelevant.

   b.   *The Court's Decision on this Question at the Motion-to-Dismiss Phase*

Defendant's argument that the Fund enjoys GBP status largely tracks the

argument it advanced in a Rule 12(b)(6) motion at the outset of this case.  (*See* ECF

No. 22.)  The Court denied that motion, reasoning that it raised "questions of fact more

appropriate for consideration on summary judgment."  *Teets v. Great-West Life &*

*Annuity Ins. Co.*, 106 F. Supp. 3d 1198, 1203 (D. Colo. 2015) ("*Teets I*").  Although not

spelled out in detail in the Court's opinion, the parties' cited case law convinced the

Court that this case could turn on how Defendant administered the Contract in practice,

regardless of its terms.  *See, e.g.*, *Assocs. in Adolescent Psychiatry, S.C. v. Home Life*

*Ins. Co.*, 941 F.2d 561, 567 (7th Cir. 1991) ("*Adolescent Psychiatry*"); *Ferry v. Mut. Life*

*Ins. Co. of New York*, 868 F. Supp. 764, 770 (W.D. Pa. 1994).

Through discovery, the parties have now developed evidence of Defendant's

practices.  Thus, it is appropriate to revisit Defendant's Rule 12(b)(6) argument, now re-

urged through its summary judgment motion.

   c.   *Application of* Harris Trust *to Facts as Developed through Discovery*

The Supreme Court's most instructive case regarding the GBP exception is *John*

*Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank*, 510 U.S. 86 (1993)

("*Harris Trust*").  Again, a GBP is "an insurance policy or contract to the extent that such

policy or contract provides for benefits the amount of which is guaranteed by the

insurer."  29 U.S.C. § 1101(b)(2)(B).  "Notably," the Supreme Court said of this

definition, "the [GBP] exemption is not available to 'any' insurance contract that provides

for guaranteed benefits but only 'to the extent that' the contract does so."  *Harris Trust*,

510 U.S. at 97.  Thus, a contract's various "component parts" often must be examined

separately to understand whether each one meets the GBP test.  *Id.* at 102.  "A component fits within the [GBP] exclusion," the Supreme Court held, "only if it allocates investment risk to the insurer.  Such an allocation is present when the insurer provides a genuine guarantee of an aggregate amount of benefits payable to retirement plan participants and their beneficiaries."  *Id.* at 106.  As to any component of a contract governing

> funds in excess of those that have been converted into guaranteed benefits[,] these indicators are key [to determining whether the investment risk rests on the insurer]: the insurer's guarantee of a reasonable rate of return on those funds and the provision of a mechanism to convert the funds into guaranteed benefits at rates set by the contract.

*Id.*

The undisputed facts regarding the Contract's terms, and regarding Defendant's actual performance under the Contract, show that the Contract allocates investment risk to Defendant because Defendant provides a genuine guarantee of benefits payable to plan participants.  In particular, the Contract genuinely guarantees the all principal contributed by Plan participants and all earned interest (which is credited daily).  Moreover, the Contract genuinely guarantees the Credited Rate for the quarter in which the Credited Rate is operative.  As to that latter feature specifically, the Contract "resemble[s] nothing so much as a series of fixed annuities, each one [quarter] in duration."  *Adolescent Psychiatry*, 941 F.2d at 567.[4]  Thus, Defendant bears the risk of

---

[4] In the Court's order on Defendant's Rule 12(b)(6) motion, the Court noted Defendant's heavy emphasis on *Adolescent Psychiatry* but stated, "While persuasive, [*Adolescent Psychiatry*] predates *Harris Trust*, and is not binding in this Circuit.  Instead, the Court must decide this case under binding Supreme Court precedent."  *Teets I*, 106 F. Supp. 3d at 1203 n.2.  Having thoroughly reviewed *Adolescent Psychiatry* again in this summary judgment posture, the Court is convinced that the Seventh Circuit was applying essentially the same test

market fluctuations that might reduce the value of, or the interest generated from, the securities into which Fund money is invested.  Plan participants bear none of this risk.  Consequently, the Contract, at least as to the foregoing components, is a GBP.

2.      Discretion to Set the Credited Rate

Ultimately, however, the GBP exception does not get Defendant where it wants to go.  That is because the exception, by its terms, is quite limited: "In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer."  29 U.S.C. § 1101(b)(2).  Admittedly it may take several readings to understand this opaque language, but the meaning eventually becomes clear, particularly with the background understanding that life insurers have generally placed the proceeds used to purchase annuities into their general accounts, investing that money alongside all other money the life insurer has received:

> [T]he serious ramifications of classifying general account assets as [ERISA] plan assets are quite clear.
>
> As a fiduciary, a life insurance company would be required under ERISA to manage its [entire] general account . . . solely in the interest of participants and beneficiaries of employee benefit plan contractholders and for the exclusive purpose of providing benefits to such participants and beneficiaries.  However, . . . the assets in the general account are derived from all classes of an insurer's business (i.e., life insurance, health insurance and annuities), and the principal functions which an insurer must perform in

that the Supreme Court later endorsed in *Harris Trust*, namely, an examination of which party principally bears the investment risk.  This Court cannot say whether the Supreme Court would have agreed with the Seventh Circuit's application of that test to the facts before it, but the Seventh Circuit at least engaged in the correct inquiry.  Even so, *Adolescent Psychiatry* does not go as far as Defendant wishes.  *See infra* n.8.

> managing its business (the selection and control of risks, the
> investment and management of assets to support obligations
> with respect to such risks, and the distribution and allocation
> of surplus among policyholders) require the insurer to
> consider the interests of all of its contract holders, creditors
> and shareholders.  Therefore, the application of ERISA's
> exclusive benefit rule would place an insurer in an untenable
> position of divided loyalties.  Indeed, such a standard of
> conduct would directly conflict with the scheme of state
> insurance regulation which is designed to assure that an
> insurer maintain equity among its various constituencies.

Stephen H. Goldberg & Melvyn S. Altman, *The Case for the Nonapplication of ERISA to Insurers' General Account Assets*, 21 Tort & Ins. L.J. 475, 476–77 (1986) ("Goldberg & Altman") (footnotes omitted).  The GBP exception was thus "intended to free insurance companies from the potential conflict between managing plan assets for the benefit of participants and beneficiaries, on one hand, and, on the other, the operation of the insurer's general account which requires the equitable spreading of risks among all policy holders."  *Mogel v. UNUM Life Ins. Co. of Am.*, 547 F.3d 23, 27 (1st Cir. 2008).[5]

        Parsing this out, then, the only effect of the GBP exception, if it applies, is to free the insurer from the requirement to manage its general account solely for the benefit of ERISA plan participants whose contributions reside in the general account.  Stated differently, the GBP exception essentially prohibits a plaintiff from claiming that the insurer breached its fiduciary duty by making imprudent choices when investing plan participants' contributions.  But the contract by which the insurer obtained those contributions remains a part of the plan, and the insurer may still have fiduciary

_____

[5] Plaintiff criticizes this portion of *Mogel* because it relies on a district court decision that in turn relies on the Goldberg & Altman article, which Plaintiffs says was "presented to and rejected by the Supreme Court in *Harris Trust*."  (ECF No. 206 at 14 n.10.)  But the Supreme Court only rejected certain of Goldberg & Altman's interpretations of potentially ambiguous language regarding the GBP exception, and certain policy arguments found in that article.  The Supreme Court did not reject Goldberg & Altman's basic statement of the purpose of the GBP exception.  Goldberg & Altman and *Mogel* are actually helpful to Plaintiff in that regard.

responsibilities in administering that contract.  *See id.* (the GBP exception "does not alter the fiduciary duties imposed on an insurer with respect to the management and administration of a plan as opposed to the oversight of investment policy").

      a.    *Discretion as to Credited Rate Itself*

Plaintiff claims, correctly, that regardless of the GBP exception, the Contract is still part of the Plan and Defendant may have fiduciary responsibilities when it makes discretionary decisions regarding the Contract, such as setting the Credited Rate.  (ECF No. 175 at 20–24.)  To this, Defendant responds that the decision to set the Credited Rate is not an instance of "discretionary authority," "discretionary . . . control," or "discretionary responsibility" that would trigger ERISA fiduciary status.  *See* 29 U.S.C. § 1002(21)(A)(i) & (iii).  This is so, according to Defendant, because it does not have "the 'final say'" on whether the Credited Rate will actually apply given that participants can withdraw their money from the Fund at any time without fees or charges.  (ECF No. 189 at 24–28.)

ERISA, by its terms, does not appear to turn on which party has the "final say." Rather, it speaks in terms of exercising "authority" or "control" or "responsibility," which—in some sense—Defendant undoubtedly does when it sets the Credited Rate. But Defendant is correct that there are a number of cases favoring the theory that a pre-announced rate of return prevents fiduciary status from attaching to the decision regarding the what rate to set, at least when the plan and/or its participants can "vote with their feet" if they dislike the new rate.[6]

---

[6] As will become clear below, none of these cases arises from the Tenth Circuit.  The parties have not cited, nor has the Court located, any relevant Tenth Circuit authority on this question—or, for that matter, any substantive question raised in the parties' briefs.

The first such case is *Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co.*, 713 F.2d 254 (7th Cir. 1983) ("*CBOE*").  There, the insurance company administered a "Guaranteed Account" that, similar to the Fund, guaranteed principal and credited interest at a rate announced in advance.  *Id.* at 256.  The insurance company later decided to exercise unilateral authority under its contract to force participants to transfer their contributions from the Guaranteed Account into a new "Guaranteed Account B."  *Id.*  The amount of those forced transfers was 10% of the Guaranteed Account balance each year for the next ten years, which corresponded with another contractual provision that allowed the insurance company to prevent further withdrawals after 10% of an account had been withdrawn in a single year.  *Id.*  The plaintiff believed that the insurance company had intentionally set up Guaranteed Account B and mandated 10% transfers to trigger the withdrawal restriction and more-or-less freeze the guaranteed funds for the benefit of the insurance company.  *Id.*

The plaintiff sued, arguing that the insurance company had breached its fiduciary duties under ERISA by unilaterally amending the contract in favor of the insurance company.  The Seventh Circuit's held that the plaintiff had stated a viable ERISA claim, and in the process created a distinction on which Defendant now relies:

> For our purposes the relevant question is whether the power to amend the contract constitutes the requisite "control respecting . . . disposition of [plan] assets." 29 U.S.C. § 1002(21)(A).  Had [the plaintiff] simply given Plan assets to [the insurance company] and said, "Invest this as you see fit and we will use the proceeds to pay retirement benefits," [the insurance company] would clearly have sufficient control over the disposition of Plan assets and be a fiduciary under ERISA.  *Because [the insurance company] guaranteed the rate of return in advance for the Guaranteed Accounts, that is not the case here.*  Nevertheless, the policy itself is a Plan asset, and [the insurance company's] ability to amend it, and

> thereby alter its value, is not qualitatively different from the ability to choose investments.  By locking [the plaintiff] into the Guaranteed Accounts for the next 10 years [the insurance company] has effectively determined what type of investment the Plan must make.  In exercising this control over an asset of the Plan, [the insurance company] must act in accordance with its fiduciary obligations.

*Id.* at 260 (emphasis added; certain citations omitted).  The clear import of the italicized language is the assumption that announcing the rate of return in advance excuses the insurance company from fiduciary responsibilities as to that rate, and that such discretion over a pre-announced rate of return is *not* equivalent to amending the contract, nor qualitatively the same as the ability to choose investments.

The next helpful decision is *Midwest Community Health Service, Inc. v. American United Life Insurance Co.*, 255 F.3d 374 (7th Cir. 2001).  Somewhat similar to *CBOE*, the insurance company in *Midwest Community* had contractual authority to make unilateral changes to certain aspects of the retirement plan.  *Id.* at 375.  Also, if the plan sponsor wanted to terminate the insurance company, it would be assessed certain charges and "adjustments" to the plan balance.  *Id.*  Eventually, the insurance company exercised its unilateral authority in a way that displeased the plan sponsor, and the sponsor sued, claiming that the ability to unilaterally amend the contract was an act that must comport with ERISA fiduciary standards.  *Id.* at 375–76.  Citing *CBOE*, among other cases, the Seventh Circuit agreed: "Here, [the insurance company] exercised its discretionary authority to amend the [relevant contract] and altered the contract's value."  *Id.* at 379.  By negative implication, then, *Midwest Community* affirms that a seemingly discretionary decision under a contract with different features (such as the supposition in *CBOE* regarding pre-announced interest rates) might not be subject to fiduciary requirements.

Another useful decision is *Charters v. John Hancock Life Insurance Co.*, 583 F. Supp. 2d 189 (D. Mass. 2008).  In *Charters*, the insurance company controlled which investment options would be made available to plan participants, and in particular, had the authority to force a substitution—*i.e.*, to transfer all investments in one fund to a different fund.  *Id.* at 198.  The insurance company argued that it was not a fiduciary when forcing those substitutions because the plan sponsor could reject that substitution.  *Id.*  The district court disagreed because the sponsor's only real way to reject a substitution would be to terminate the relationship with the life insurance company and find a different administrator.  *Id.* at 198–99.  Moreover, in choosing to terminate, the sponsor would be subject to a termination fee and various administrative charges.  *Id.* at 199.  "Because of the built-in penalties, [the sponsor] did not have *a meaningful opportunity to reject substitutions*," and the insurance company was therefore not relieved of fiduciary status when making substitutions.  *Id.* (emphasis added).  *Charters*, by negative implication, supports Defendant's position that a meaningful opportunity to reject a decision removes that decision from ERISA scrutiny.

The decision that most clearly favors Defendant is *Zang v. Paychex, Inc.*, 728 F. Supp. 2d 261 (W.D.N.Y. 2010).  This was another case about service provider's[7] allegedly unilateral control over investment options made available to plan participants.  *Id.* at 262–64.  The district court found, however, that the service provider was contractually required to give the plan sponsor at least sixty days' notice of a proposed change in that regard, and a right to reject the change or terminate the agreement.  *Id.* at 271.  In practice, the right to reject really only amounted to a right to terminate and

---

[7] The defendant in *Zang* was not a life insurance company, but provided the same services as the life insurance companies in the cases discussed above.

move the plan's business elsewhere.  *Id.* at 271 n.6.  Nonetheless, the district court

stated that the arrangement "does not bespeak fiduciary status on the part of [the

service provider]."  *Id.* at 271.[8]

Plaintiff attempts to portray the foregoing cases either as favoring him in some

way, or as distinguishable on their facts.  (*See* ECF No. 175 at 24; ECF No. 206 at 12 &

n.7, 11–12.)  Plaintiff's distinctions are not persuasive, and notably, Plaintiff does not

argue that any of these cases was wrongly decided.  Certain other cases, which Plaintiff

favors, are nonetheless worth discussing.

The first is *Ed Miniat, Inc. v. Globe Life Insurance Group, Inc.*, 805 F.2d 732 (7th

Cir. 1986).  There, the insurance company had an "apparent unilateral right" to reduce

credited interest to a specified floor and increase the amount of the required annual

premium to a specified maximum.  *Id.* at 734 (internal quotation marks omitted).  The

insurance company eventually exercised both powers, prompting the plan sponsor to

terminate its contract with the insurance company.  *Id.*  That, in turn, prompted the

insurance company to withhold "more than half of the premiums paid by plaintiffs to fund

the plan" as an exit fee.  *Id.* (internal quotation marks omitted).  The insurance company

---

[8] To the list of cases supporting its view, Defendant would likely add *Adolescent Psychiatry*.  That case is generally helpful for the notion that a pre-announced rate of return can be analogized to a series of fixed annuities.  *See* 941 F.2d at 567.  However, that analogy only permitted the Seventh Circuit to conclude that the GBP exception applied, meaning only that the insurance company "was not holding its entire investment portfolio [*i.e.*, the investments in its general account] as the [retirement plan's] fiduciary."  *Id.* at 568.  "Still," the court went on, "the [investment vehicle in question] was an asset of [the retirement] plan.  If [the insurance company] had discretionary authority over that instrument, [it is an] ERISA fiduciar[y]."  *Id.*  That is precisely the argument Plaintiff makes here.  Surprisingly, however, the plaintiff in *Adolescent Psychiatry* did *not* claim that the decision setting the pre-announced interest rate was a matter of discretionary authority subject to ERISA.  Rather, the plaintiff focused on the insurance company's unilateral authority to amend other terms of the contract.  *Id.* at 569.  Thus, *Adolescent Psychiatry* provides little guidance on whether pre-announced interest rates are themselves subject to fiduciary scrutiny.

argued that its choices to decrease the interest rate and increase the annual premium were part of its bargained-for authority under the contract, and therefore not subject to ERISA scrutiny. *Id.* at 737. The Seventh Circuit disagreed: "No discretion is exercised when an insurer merely adheres to a specific contract term. When a contract, however, grants an insurer discretionary authority, even though the contract itself is the product of an arm's length bargain, the insurer may be a fiduciary." *Id.* Borrowing language from *CBOE*, the Seventh Circuit went on to hold that the insurance company's power "does not appear to be qualitatively different from the ability to choose investments." *Id.* at 738.

*Ed Miniat*'s appeal to Plaintiff's is plain, but *Ed Miniat* is ultimately unhelpful to Plaintiff's cause, for several reasons. First, *Ed Miniat* quotes in full, without a hint of disapproval, the passage from *CBOE* stating that a pre-announced, guaranteed rate of return excuses the insurance company from fiduciary responsibilities as to that rate. *Id.* at 737–38. Thus, it indirectly reaffirms the portion of *CBOE* on which Defendant relies. Second, *Ed Miniat* had not progressed beyond the motion to dismiss phase, which is why the insurance company's unilateral rights were described as "apparent." Here, the nature of Defendant's contractual rights and how Defendant has exercised them has been established through discovery. Third, *Ed Miniat* contains no discussion of the ability to protest changes or exit without paying a fee (the allegations established that the insurance company charged an enormous exit fee). Thus, for present purposes, *Ed Miniat* establishes—correctly, in this Court's view—that the mere fact of discretion embodied in an arms-length, bargained-for contract does not mean that ERISA's fiduciary duties are *per se* excused as to exercises of such discretion. But that general

principle does not answer the question of whether ERISA fiduciary duties govern a discretionary choice that the affected party may reject.

The other decision of note is *Pipefitters Local 636 Insurance Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861 (6th Cir. 2013). This was a dispute about a state-mandated fee that a health insurer passed on to employers offering that insurer's health plan. *Id.* at 863–65. The health insurer argued that it was "merely act[ing] as a 'pass-through' [to the state] and not as a fiduciary." *Id.* at 866. However, the health insurer did not charge the fee to all participating employers, and the plan contract did not set forth any method by which the fee would be calculated and passed on. *Id.* at 866–67. Thus, the insurer "necessarily had discretion in the way it collected [the fee]," and was therefore an ERISA fiduciary in making fee-related decisions. *Id.* at 867.

*Pipefitters*, even more than *Ed Miniat*, is too factually dissimilar to provide guidance here. In particular, *Pipefitters* says nothing about the "final say" theory reflected in *CBOE*, *Midwest Community*, *Charters*, and *Zang*. The Court is persuaded that those cases correctly state the scope of ERISA. Thus, if the all the circumstances of the alleged ERISA-triggering decision show that the defendant does not have power to force its decision upon an unwilling objector, the defendant is not acting as an ERISA fiduciary with respect to that decision.

Plaintiff argues, however, that even this standard is not satisfied. Plaintiff's first argument in this regard is that none of Defendant's cases specifically discuss individual plan participants' (*i.e.*, the employees') ability to reject the insurance company's decision. Rather, these cases focus on the plan sponsor's (*i.e.*, usually, the employer's) ability to reject the decision. (ECF No. 193 at 23–24.) Plaintiff is correct, but Plaintiff

does not explain why this is a distinction with a difference.  Nor does the Court perceive

a meaningful distinction.  ERISA does not impose obligations on retirement plans purely

for those plans' sake, but because Congress was concerned with *plan participants'*

welfare.  Plan participants' "veto" authority is therefore as relevant as plan sponsors'

authority.

Plaintiff also argues that the Plan itself cannot easily withdraw from the Fund

because the Contract imposes a waiting period of up to one year.  (ECF No. 206 at 12.)

This is not an argument that the Court can consider in the present posture.  The

Contract does not *mandate* a one-year waiting period, so whether it would actually be

imposed in any particular instance is speculative.  And the decision itself whether to

impose it might be separately challengeable as an exercise of ERISA discretion.

Finally, Plaintiff argues that Plan participants actually face significant barriers to

divesting from the Fund because the Fund is the only stable value product Defendant

will permit as to plans its services.  (ECF No. 193 at 25.)  The Court has given serious

thought to this contention, but notes that it introduces a host of other considerations

individual to each participant (*e.g.*, investment time horizon and overall preferred risk

profile).  Thus, the Court finds that this presents too attenuated a basis to say that a

Plan participant has no real ability to reject Defendant's Credited Rate.

b.    *Discretion as to Defendant's Own Compensation*

Plaintiff additionally asserts that Defendant breached its fiduciary duties because,

by setting the Credited Rate, Defendant controlled the margin and in turn controlled its

own compensation.  (ECF No. 175 at 24–25.)  Plaintiff is correct that, "after a person

has entered into an agreement with an ERISA-covered plan, the agreement may give it

such control over factors that determine the actual amount of its compensation that the

person thereby becomes an ERISA fiduciary with respect to that compensation." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir. 1987). But, although broad-sounding, it appears this principle has only been applied in cases where the alleged fiduciary has some form of direct contractual authority to establish its fees and other administrative charges, or has authority to approve or disapprove the transactions from which it collects a fee. *See Pipefitters*, 722 F.3d at 867 (insurer had complete discretion in how to collect from plans the money needed to pay a state-mandated fee); *Abraha v. Colonial Parking, Inc.*, 243 F. Supp. 3d 179, 186 (D.D.C. 2017) (exercise of contractual authority to change from a flat per-participant fee to a percentage-of-contributions fee was an exercise of discretion over service provider's own compensation, and therefore subject to ERISA fiduciary obligations); *Golden Star, Inc. v. Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 80–81 (D. Mass. 2014) (insurer had contractual discretion to set a "management fee" between zero and 1%; fact question existed as to whether it ever exercised such discretion); *Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 931 F. Supp. 2d 296, 304 (D. Mass. 2013) (bank had discretionary authority to set a "lending fee" anywhere from zero to 50%); *Charters*, 583 F. Supp. 2d at 197 (insurer was a fiduciary because it had complete discretion to set an "administrative maintenance charge," up to a specified maximum, levied against certain plan accounts); *Sixty-Five Security Plan v. Blue Cross & Blue Shield*, 583 F. Supp. 380, 387–88 (S.D.N.Y. 1984) (insurer's compensation was a percentage of claims paid, and insurer had discretion whether to pay a claim; therefore, insurer was a fiduciary as to its own compensation). Accordingly, these cases are inapposite to the present circumstances.

Moreover, the Court agrees with Defendant that it is

> not an ERISA fiduciary as to its own compensation because
> it does not control what its plan-related compensation will be.
> To be sure, by determining what Credited Rates to offer,
> [Defendant] can influence its possible margins if plans and
> their participants invest in the Fund at those guaranteed
> rates.  But its compensation (if any) depends on participants
> investing their accounts at those Credited Rates, and—
> because the Credited Rates are stated in advance and
> participants are free to withdraw their investments at any
> time without penalty—participants can reject a Credited Rate
> before it ever applies.

(ECF No. 189 at 29–30 (footnote omitted).)  The Court accordingly rejects Plaintiff's

argument that it may hold Defendants to fiduciary standards under the theory that

Defendant sets its own compensation.

\*   \*   \*

For all of the foregoing reasons, summary judgment is appropriate against

Plaintiff on his Claims One and Two.

## B.   Nonfiduciary Liability (Claim Three)

Even if Defendant is not an ERISA fiduciary, it may still be a "party in interest"—

meaning, among other things, "a person providing services to [an employee benefit]

plan."  29 U.S.C. § 1002(14)(B).  Plaintiff's Claim Three alleges that Defendant can still

be liable as a party in interest for essentially all the relief Plaintiff seeks under Claims

One and Two, as follows.

ERISA establishes that "[a] fiduciary with respect to a plan shall not cause the

plan to engage in a transaction, if he knows or should know that such transaction

constitutes a direct or indirect \* \* \* use by or for the benefit of a party in interest[] of any

assets of the plan."  29 U.S.C. § 1106(a)(1)(D).  Moreover, the Supreme Court held in

*Harris Trust & Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000)

("*Salomon*"), that the party in interest on the receiving end of such a transaction may be liable under ERISA if it "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful."  *Id.* at 251.

Given this, Plaintiff argues

> [t]here can be no dispute that [Defendant] used the Contract (which is a plan asset) to set the Credited Rate, collect contributions and pay interest to plan participants at the Credited Rate, and retain the margin.  By permitting [Defendant], a party in interest, to use a plan asset [for Defendant's own benefit, *i.e.*, by retaining the margin], the plans' fiduciaries [such as the non-party Plan Fiduciaries in this case] violated [29 U.S.C. § 1106(a)].  Even if [Defendant] [is] not a fiduciary, it is liable for its participation in this prohibited transaction.

(ECF No. 175 at 31 (certain citations omitted).)  Plaintiff specifically represents that he seeks "disgorgement of profits" from Defendant, which Plaintiff claims to be equivalent to "an 'accounting for profits.'"  (ECF No. 193 at 41.)

Plaintiff's equitable label for the monetary relief it seeks flows from the fact that ERISA does not permit a court to award damages *per se*, but instead authorizes a court "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to [award] other appropriate equitable relief."  29 U.S.C. § 1132(a)(3).  What qualifies as "other appropriate equitable relief" has snarled litigants and judges for years.  It is nonetheless established that an order to pay money, even if functionally equivalent to a judgment awarding damages, qualifies as "appropriate equitable relief" in some ERISA cases, depending on the circumstances.  *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212–21 (2002) ("*Knudson*").

As relevant to this case, one of those forms of money-based equitable remedies is an accounting for profits.  *Id.* at 214 n.2.  An accounting for profits (often shortened

simply to an "accounting") "is a restitutionary remedy based upon avoiding unjust enrichment.  In this sense it reaches monies owed by a fiduciary or other wrongdoer, including profits produced by property which in equity and good conscience belonged to the plaintiff."  1 Dan B. Dobbs, *Law of Remedies* § 4.3(5), at 608 (2d ed. 1993).  Plaintiff believes that the margin Defendant earned on Fund contributions are profits that belong in equity and good conscience to him and his fellow class members.

Defendant does not argue that it is not a party in interest.  Defendant also does not contest Plaintiff's assertion that a plan sponsor's choice to offer the Fund, knowing that Defendant would retain margin for itself, is a prohibited transaction under 29 U.S.C. § 1106(a).  And, somewhat surprisingly, Defendant does not argue that Plaintiff's theory appears very close to imposing liability on Defendant for matters negotiated before becoming the Plan's service provider—a theory of liability that various courts have rejected.  *See, e.g.*, *Hecker v. Deere & Co.*, 556 F.3d 575, 583 (7th Cir. 2009); *F.H. Krear*, 810 F.2d at 1259; *see also Salomon*, 530 U.S. at 252 (noting but not resolving a "concern that ERISA should not be construed to require counterparties to transactions with a plan to monitor the plan for compliance with each of ERISA's intricate details").

Defendant's primary counterargument, rather, is that an accounting is only considered an equitable remedy when pursued against a fiduciary; and, says Defendant, an ERISA plaintiff seeking an accounting must identify a specific *res* that a defendant wrongfully holds—as opposed to claiming a right to money, from whatever source defendant might obtain it.  (ECF No. 211 at 22–24.)  Defendant has cited one unpublished district court decision that comes out clearly in its favor.  *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *8 (C.D. Cal. Aug. 5, 2016)

(holding that a plaintiff bringing an accounting claim against a nonfiduciary must be able to identify specific, traceable funds in the defendant's possession).

This is a complicated issue, in part because the distinction between money-awarding remedies at law and money-awarding remedies in equity was already hazy during the era of separate law and equity courts, and has not since achieved more clarity.  *See, e.g.*, *Knudson*, 534 U.S. at 212 ("[N]ot all relief falling under the rubric of restitution is available in equity.  In the days of the divided bench, restitution was available in certain cases at law, and in certain others in equity."); *id.* at 214 (noting the "fine distinction between restitution at law and restitution in equity").  Luckily, the Court need not now resolve the question because the Court finds Defendant's alternative argument persuasive.[9]

Separate from its claim that Plaintiff does not seek "appropriate equitable relief," Defendant argues that Plaintiff simply has not made out a claim for nonfiduciary liability under the standard established in *Salomon*.  (ECF No. 189 at 40–41.)  Again, under that decision, the party in interest on the receiving end of a prohibited transaction may be liable under ERISA if it "had actual or constructive knowledge of the circumstances that rendered the transaction unlawful."  530 U.S. at 251.  And "[t]hose circumstances, in turn, involve a showing that the *plan fiduciary*, with actual or constructive knowledge of

---

[9] For the record, however, the Court notes certain authority that both parties have overlooked.  When the Supreme Court decided in *Salomon* that a nonfiduciary party in interest could potentially be liable for a transaction in violation of 29 U.S.C. § 1106(a), it was heavily influenced by the law of trusts, including the "settled" principle that a "trustee or [the trust's] beneficiaries may . . . maintain an action for restitution of [wrongfully transferred] property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of *the third person's profits derived therefrom*."  530 U.S. at 250 (emphasis added).  This is dicta, strictly speaking.  It nonetheless suggests that the distinctions Defendant draws about the availability of an accounting remedy (fiduciary vs. nonfiduciary, traceable *res* vs. otherwise) are not distinctions the Supreme Court would deem meaningful, given the trust law sources on which it has previously relied.

the facts satisfying the elements of a [29 U.S.C. § 1106(a)] transaction, caused the plan to engage in the transaction." *Id.* (emphasis in original).  Defendant's argument is correct, as demonstrated by Plaintiff's failure to distinguish these two elements of a nonfiduciary liability claim.

Quoting *Salomon*, Plaintiff claims "there is no genuine dispute that [Defendant] had 'actual or constructive knowledge of the *facts*' underlying its violation of [29 U.S.C. § 1106(a)(1)(D)]."  (ECF No. 206 at 18 (emphasis supplied by Plaintiff).)  But Plaintiff's quote is misdirected.  "Actual or constructive knowledge of the facts" comes from *Salomon*'s articulation of what a party must prove about the *plan fiduciary*, specifically, "actual or constructive knowledge of the facts satisfying the elements of a [29 U.S.C. § 1106(a)] transaction."  530 U.S. at 251.  In other words, as against a plan fiduciary offering the Fund, it appears it would be enough to prove the fiduciary's actual or constructive knowledge that Defendant retains Fund-generated margin for itself (presuming, given Defendant's failure to contest it, that allowing Defendant to retain the margin is a prohibited transaction).  The Court may assume that the record before it establishes at least this much beyond a genuine dispute (although, again, the Plan Fiduciaries are not parties to this lawsuit).  But that is not the same standard to which *Salomon* holds the nonfiduciary party in interest.  As to those parties (in this case, Defendant), *Salomon* requires "actual or constructive knowledge of the circumstances that rendered the transaction unlawful."  530 U.S. at 251.

Plaintiff appears to interpret "circumstances that rendered the transaction unlawful" as establishing a standard no different from "facts satisfying the elements of a [29 U.S.C. § 1106(a)] transaction."  Or, in the context of this case, Plaintiff assumes that

simple knowledge that Defendant retains Fund-generated margin is enough to satisfy both elements of a nonfiduciary liability claim. The Court cannot agree. Although *Salomon* was not purporting to write a statute or a jury instruction, the Court discerns significant differences between the language used to describe the requisite knowledge of a plan fiduciary and the requisite knowledge of a nonfiduciary party in interest.

As to a plan fiduciary, "facts satisfying the elements of a [29 U.S.C. § 1106(a)] transaction" seems plainly aimed at requiring only a knowledge of basic facts, particularly that the party in interest will use plan property for its own gain. This would be consistent with "the great weight of authority" holding that § 1106(a) violations are essentially strict liability offenses. *Chao v. Hall Holding Co.*, 285 F.3d 415, 442 n.12 (6th Cir. 2002). But, as to a nonfiduciary party in interest, the standard is "circumstances that rendered the transaction unlawful." Particularly in contrast to the fiduciary standard, this language appears aimed at exploring not just knowledge of the underlying facts, but knowledge of their potential unlawfulness. Indeed, the Supreme Court announced this standard specifically in the context of noting the limits of third-party liability. The entire relevant passage is as follows:

> It also bears emphasis that the common law of trusts sets limits on restitution actions against defendants other than the principal "wrongdoer." Only a transferee of ill-gotten trust assets may be held liable, and then only when the transferee (assuming he has purchased for value) knew or should have known of the existence of the trust and the circumstances that rendered the transfer in breach of the trust. Translated to the instant context, the transferee must be demonstrated to have had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. Those circumstances, in turn, involve a showing that the *plan fiduciary*, with actual or constructive knowledge of the facts satisfying the elements of a § 406(a) transaction, caused the plan to engage in the transaction.

*Salomon*, 530 U.S. at 251 (emphasis in original).

Requiring a heightened showing as to nonfiduciary parties in interest is also consistent with the treatises the Supreme Court relied upon in *Salomon* to conclude that such parties may be liable in some circumstances. *See id.* at 250–51 (analyzing treatises); *cf. Knudson*, 534 U.S. at 217 (endorsing many of the same treatises as guides to determining whether a form of relief is legal or equitable). For example, section 284 of Restatement (Second) of Trusts (cited in *Salomon*, 530 U.S. at 250), states that a third party "is under no liability to the beneficiary [of the trust]" where the third party is "not knowingly taking part in an illegal transaction [involving trust property]." And section 291 of the same Restatement (also cited in *Salomon*, 530 U.S. at 250) similarly requires that the third party must "take[] [trust property] with notice of the breach of trust" before the party "can be compelled * * * to restore it to the trust, together with the income which he has received from the property."[10]

Accordingly, an ERISA plaintiff cannot rely solely on the knowledge that would satisfy a fiduciary's liability for a prohibited transaction to likewise hold a nonfiduciary party in interest liable for that transaction. Rather, the plaintiff must show that the defendant knew or should have known that the transaction violated ERISA. Plaintiff has not attempted to make this showing, but has instead continually asserted only that the undisputed facts show Defendant had the basic knowledge necessary to make a

---

[10] The Third Restatement, which was published after *Salomon*, is even more direct on these points. *See* Restatement (Third) of Trusts § 108 (2012) ("(1) A third party is protected from liability in dealing with or assisting a trustee who is committing a breach of trust if the third party does so without knowledge or reason to know that the trustee is acting improperly. * * * (3) In dealing with a trustee, a third party need not: (a) inquire into the extent of the trustee's powers or the propriety of their exercise . . . ."); *id.* cmt. d ("Knowledge of and compliance with the powers and duties of the trusteeship are responsibilities of the trustee, whose fiduciary obligations are enforceable by the beneficiaries.").

*fiduciary* liable.  (*See* ECF Nos. 175 at 31; ECF No. 206 at 17–18.)  Thus, Plaintiff's

Claim Three fails as a matter of law and summary judgment in Defendant's favor is

appropriate.[11]

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Defendant's Motion for Summary Judgment (ECF No. 181) is GRANTED;

2.  Plaintiff's Motion for Partial Summary Judgment (ECF No. 182) is DENIED;

3.  Defendant's Motion to Decertify Class (ECF No. 180) is DENIED AS MOOT;

4.  Defendant's Unopposed Motion to Schedule Oral Argument (ECF No. 217) is

DENIED;

5.  The Final Trial Preparation Conference scheduled for April 27, 2018, and the

bench trial scheduled to begin on May 14, 2018, are both VACATED;

6.  The Clerk shall enter judgment in favor of Defendant and against Plaintiff and the

Class, and shall terminate this case; and

7.  Defendant shall have its costs upon compliance with D.C.COLO.LCivR 54.1.

---

[11] In *Salomon*, the Supreme Court noted a "conflict of authority in non-ERISA cases" on "[t]he issue of which party, as between the party seeking recovery and the defendant-transferee, bears the burden of proof on whether the transferee is a purchaser for value and without notice." 530 U.S. at 251 n.3.  That issue was "not currently before [the Court]," and so it did not resolve it.  *Id.*  Nor has this Court located any later authority resolving the conflict.  However, it is immaterial here.  Plaintiff has asserted nonfiduciary liability as a specific claim for relief (Claim Three), and it would be rare indeed for any plaintiff to be able to assert a cause of action and then throw all the burden on the defendant to disprove it.  Moreover, Plaintiff's briefs repeatedly argue that Defendant bears the burden of proof on certain questions (*see* ECF No. 175 at 5, 31–32, 35, 41; ECF No. 193 at 4, 24 n.7, 26, 33), but Plaintiff nowhere argues that Defendant bears the burden of proof on Claim Three.  Accordingly, Plaintiff has forfeited any argument that the burden of proof for Claim Three rests on Defendant.

Dated this 14th day of December, 2017.

BY THE COURT:

_____

William J. Martinez
United States District Judge